Voinovich et al. *v.* Ferguson et al.

[Cite as *Voinovich v. Ferguson* (1992), 63 Ohio St.3d 198.]

(No. 91–1882—Submitted February 10, 1992—Decided February 14, 1992.)

Benesch, Friedlander, Coplan & Aronoff, N. Victor Goodman, James F. DeLeone, Orla E. Collier III and Mark D. Tucker, for plaintiffs.

Faruki, Gilliam & Ireland, Armistead W. Gilliam, Jr., Ann Wightman and Laura A. Sanom, for defendants Thomas E. Ferguson and Barney Quilter.

Lee I. Fisher, Attorney General, Kathleen McDonald O'Malley and Theresa Rittinger Schaefer, for defendant Lee Fisher.

Lewis & Spencer and Scott W. Spencer, for defendant Charles E. Henry.

Buckingham, Doolittle & Burroughs and Richard G. Reichel, for defendant Grace Drake.

*Per Curiam.* Plaintiffs and defendants and counterclaimants Henry and Drake raise the issue of the constitutionality of Senate District 32. It is agreed that the district does not meet the population requirements of Section 4 of Article XI, Ohio Constitution, as its population is only 308,942 persons, 93.99 percent of a senate ratio of representation (328,700 persons). Section 4 prohibits creation of a district containing less than 95 per cent of a ratio.

Plaintiffs, defendants in the counterclaims, contend, however, that leaving Senate District 32 underpopulated was unavoidable because irreconcilable conflicts with Sections 9 and 11 of Article XI, Ohio Constitution, prevented adding population from adjacent territory. Section 9 provides that where the population of a county is at least 90 percent of a house ratio of representation, "reasonable effort shall be made to create a house of representatives district consisting of the whole county." Section 11 provides in part that "[c]ounties having less than one senate ratio of representation, but at least one house of representatives ratio of representation shall be part of only one senate district."

We hold that Sections 4, 9, and 11 of Article XI are coequal. When such provisions are irreconcilable, those public officials designated to apportion the state by Section 1 of Article XI have the duty to choose the proper course, and this court will not order them to correct one constitutional violation by committing another.

The court finds against the counterclaimants on their claim that the plan is unconstitutional and, accordingly, we find the plan to be constitutional.

*Judgment accordingly.*

MOYER, C.J., HOLMES, DOUGLAS and MILLIGAN, JJ., concur.

SWEENEY, H. BROWN and RESNICK, JJ., dissent.

JOHN R. MILLIGAN, JR., J., of the Fifth Appellate District, sitting for WRIGHT, J.

MOYER, C.J., concurring. I concur with the *per curiam* decision and write separately to state my opinion.

Having previously expressed my decision with respect to the issues of standing and justiciability of the issues before us, I find no need to restate them here. See 62 Ohio St.3d 1224, 584 N.E.2d 737.

The complaint filed by plaintiffs Voinovich, Aronoff and Taft presented a conflict between Sections 4, 8, and 11 of Article XI of the Ohio Constitution as they relate to Senate District 32 in the apportionment plan. It also sought a general declaration that the plan complied with all other articles of the Ohio

Constitution and sections of Article XI, the Fourteenth and Fifteenth Amendments to the United States Constitution, the Voting Rights Act of 1965, and other applicable federal and state laws. However, that boilerplate language did not indicate the existence of any case or conflict or justiciable issue.

When defendants, Auditor of State and Representative Quilter, caused the case to be removed to federal district court, they filed answers and counterclaims in the federal district court case. After the federal district court remanded the case to this court for the reasons that it did not have subject matter jurisdiction, that there was no controversy under Article XI of the Ohio Constitution, and that plaintiffs lacked standing to bring the action, defendants withdrew their answers and counterclaims that had been filed in the federal district court. No counterclaims have been filed in this court by those defendants.

The second amended answer and counterclaim filed by defendants in the federal district court on October 8, 1991, alleged that the majority apportionment plan violated Sections 3 and 7 of Article XI. The third paragraph of the counterclaim alleged, *inter alia:* "In drawing the boundaries of the legislative districts, Plaintiffs violated Article XI, § 7 of the Ohio Constitution, which provides that district boundaries established by the preceding apportionment shall be adopted to the extent reasonably consistent with the requirements of Section 3 * * *." That paragraph is followed by seven paragraphs stating specific examples of alleged violations of Sections 3 and 7 of Article XI. The counterclaim placed in issue the application of Sections 3 and 7 of Article XI and alleged that the majority plan violated those sections.

On November 6, 1991, plaintiffs moved in this court to amend their complaint. The amended complaint was filed on November 20 and contained new allegations referring to the sections of Article XI that were raised in defendants' counterclaim and that were not placed in controversy in plaintiffs' original complaint. It is clear from a reading of the plaintiffs' first amended complaint that the allegations with respect to Sections 3, 7, and 10 are in effect a response, indeed a defense, to defendants' second amended counterclaim filed in the federal district court. On November 20, 1991, the same day plaintiffs filed their amended complaint in this court, defendants Ferguson and Quilter filed a notice of withdrawal of their answer and counterclaim and first and second amended answers and counterclaims filed in the federal district court.

I previously supported the judgment of this court that plaintiffs had standing to bring this action. It is clear now that the only justiciable issue remaining in plaintiffs' amended complaint is the dispute regarding Senate District 32 and House District 68 and the inconsistency between Sections 3, 4,

8, and 11 of Article XI, as alleged in paragraph 34 of plaintiffs' amended complaint. There is no other justiciable issue or controversy before us upon which to issue a declaratory judgment. See *Burger Brewing Co. v. Liquor Control Comm.* (1973), 34 Ohio St.2d 93, 63 O.O.2d 149, 296 N.E.2d 261.

On the merits of that issue, I conclude that neither Section 4 nor Section 11 of Article XI has priority over the other section. The effect of this conclusion is that the apportioning persons who are required, pursuant to Section 1, Article XI of the Ohio Constitution, to draw the boundaries for legislative districts may use their discretion with respect to the application of these two sections of Article XI. Because both sections are equal in their priority, there is no reason for this court to second-guess what is clearly and properly under the Constitution a political judgment by the apportioning persons.

For the foregoing reasons, I conclude that Senator Henry's counterclaim challenging the constitutionality of Senate District 32 is not well taken. The apportionment plan therefore is constitutional. However, the apportioning persons should make the technical corrections consistent with plaintiffs' Exhibit 13.

HOLMES, J., concurring separately. First, I must point out that which I had previously set forth in my dissent from the prior entry granting additional briefing on the issue of standing of the plaintiffs in this action. At such time I unequivocally concluded that the plaintiffs had standing, that the plaintiffs had presented justiciable issues to this court, and that no further extensive briefing was necessary. Further, I stated that this court should proceed to determine the merits of the issues presented by way of the plaintiffs' complaint as well as the counterclaims of the defendants. In this regard I stated in my dissent:

"It should be clear that there, in fact, exists an actual controversy. There is little legal reality in the assertion that no controversy exists between the plaintiffs and the defendants, while at the same time pursuing their claims and cross-claims against these plaintiffs in other forums.

"Defendant Fisher, the Attorney General of Ohio, as well as the defendants Ferguson and Quilter, also assert that the plaintiffs lack standing to bring this action. This argument I believe to have no merit. First, the plaintiffs bring this action not only in their official capacities as members of the so-called Apportionment Board, but also as qualified electors of the state of Ohio. The plaintiffs in their official capacities are the persons responsible for the apportionment of this state for members of the General Assembly, and as such have a direct and immediate interest in supporting the validity of the plan they adopted. Exemplary of such interests of the plaintiffs in the apportionment plan may be shown by again referring to the federal actions

filed questioning the validity of the plan. In all such actions these plaintiffs were named as defendants, and as such were expected to defend the validity of the plan.

"Further, the plaintiffs have a real stake and standing in this plan as questioned in that if, after a review upon the merits of such plan, it is held by this court to be in conflict with Sections 3, 4, 7, 8, 9, 10 or 11, Article XI of the Ohio Constitution, the 'Apportionment Board' or a majority thereof, must, pursuant to Section 13, Article XI, again convene to 'ascertain and determine a plan of apportionment in conformity with such provisions of this Constitution as are then valid * * *.'

"Accordingly, the Constitution has placed an additional and continuing concern and burden upon the members of the 'Apportionment Board' to respond to any judicial construction of the plan finding portions thereof unconstitutional or invalid. These concerns, and potential burdens of additional voluminous work upon a new plan, provide additional tangible evidence of the standing of these plaintiffs." *Voinovich v. Ferguson* (1992), 62 Ohio St.3d 1224, 1228, 584 N.E.2d 737, 740.

In approaching the issues presented, and in interpreting the Ohio constitutional provisions applicable to these issues, several principles of constitutional construction should be remembered by this court. First, a constitution and its provisions are to be construed by the same rules as those employed in the construction of statutes, except that since the terms of the constitution are more general, the grants of power should be construed more liberally. *Franklin Cty. Bd. of Elections v. State, ex rel. Schneider* (1934), 128 Ohio St. 273, 284, 191 N.E. 115, 119.

In giving effect to any particular section of the Constitution, other sections relating to the same subject must be taken into consideration in order to harmonize, if possible, all integral parts of the same subject. *Isaac v. Intercoast Sales Corp.* (1937), 132 Ohio St. 289, 8 O.O. 49, 7 N.E.2d 216, paragraph one of the syllabus. Even when two provisions of the Constitution appear to be repugnant to each other, this court must attempt to harmonize their interpretation. *Hill v. Higdon* (1855), 5 Ohio St. 243.

As great deference is given branches of government in promulgating rules in accordance with statutes, this court should also give great weight and deference to the interpretations of another entity of government, the Apportionment Board in this instance, and to the construction its majority membership has given to constitutional provisions dealing with apportionment. See *State, ex rel. Mack, v. Guckenberger* (1942), 139 Ohio St. 273, 22 O.O. 311, 39 N.E.2d 840. Accordingly, with regard to apportionment under the Ohio

Constitution, this court stated in *State, ex rel. Gallagher, v. Campbell* (1891), 48 Ohio St. 435, 436–437, 27 N.E. 884, 885:

"Hence it is not sufficient in this proceeding that we might be of the opinion that we could make a better apportionment than has been made by the board: To authorize this court to interfere and command the board to make another apportionment, the apportionment made must so far violate the rules prescribed by the constitution, as to enable us to say, that what has been done is no apportionment at all, and should be wholly disregarded. If by any fair construction of the principles prescribed by the constitution for making an apportionment, the one made may be sustained, then it cannot be disregarded and a new one ordered."

" * * * The very fact that the governor, auditor and secretary of state are consociated as a board to apportion the state for members of the general assemb[l]y, shows of itself, that, in the judgment of the framers of the constitution, in applying the rules prescribed, a discretion would have to be exercised, and these officers were selected to exercise it. Whether the discretion conferred on the board, has been wisely or unwisely exercised in this instance, is immaterial in this proceeding. It is sufficient that they had the power under the constitution to make the apportionment as they have made it. For the wisdom, or unwisdom, of what they have done, within the limits of the powers conferred, they are answerable to the electors of the state, and no one else." *Campbell, supra,* at 442, 27 N.E. at 887.

Although disagreeing with their conclusions, I am able to understand and respectfully acknowledge the manner by which the dissenting members of this court have arrived at their conclusions as to the unconstitutionality of the apportionment plan submitted for this court's consideration. However, I am of the opinion that the majority of the Apportionment Board in designing this plan gave appropriate and due consideration to all relevant constitutional provisions, and submitted a plan which they felt lawfully and reasonably comported with the mandates of the Constitution.

This plan is not a perfect plan, and has not been held out as such by the plaintiffs, the majority of the Apportionment Board. All that the plaintiffs are asserting here is that the plan as submitted is constitutional, and with this assertion I am in agreement.

I would hold that the 1991 apportionment plan as adopted does not violate Article XI of the Ohio Constitution and specifically Sections 7 and 10 thereof. Also I would hold that House District 68 and Senate District 32 are constitutionally drawn within the framework of Article XI of the Ohio Constitution and are not in violation of Sections 3, 4, 8, or 11, Article XI.

This court, however, should order the board to correct the technical errors that exist in the plan as recognized by the plaintiffs, the majority of the board.

In that the *per curiam* opinion of the majority of this court considering this matter basically is in agreement that the plan as submitted is constitutional, I am also in agreement therewith, and concur in the *per curiam* opinion and the judgment.

DOUGLAS, J., concurring.   I concur in the majority *per curiam* opinion but for different reasons than stated therein and with some reservations.

Before proceeding I think a few words concerning the primary dissent are in order.   At least two of my valued colleagues write that " * * * [p]laintiffs have asked this court to issue a declaratory judgment that the apportionment plan is constitutional.   This complaint for declaratory judgment of necessity means that the merits of that suit are properly before this court and should be addressed.   * * * "

I recognize that this has been a strange case from its inception.   However, this deviation from what the dissenters have previously said in this case is remarkable.   In *Voinovich v. Ferguson* (1992), 62 Ohio St.3d 1224, 1230, 584 N.E.2d 737, 741 (Resnick, J., concurring in part and dissenting in part), today's three dissenters said that " * * * [w]hether the plaintiffs have standing to bring this action is an issue properly before this court, and has been fully briefed.   After considering this issue, *I find that the plaintiffs do not have standing* to bring this action and therefore would grant the motion to dismiss on that basis."   (Emphasis added.)

Now, in a 180–degree change of position, at least two of the dissenters have found standing in plaintiffs and then the dissenters proceed to become a "super apportionment board" and tell the parties how to draft a plan—all without ever having had the benefit of either side saying the dissenters' findings can be achieved.   Death-bed conversions are alive and well in Ohio— at least in the Supreme Court.

In this original action, filed in this court on September 19, 1991, the plaintiffs are the Governor of Ohio, the Secretary of State of Ohio and the President of the Ohio Senate.   Defendants are the Auditor of State of Ohio, the Attorney General of Ohio, a member of the Ohio House of Representatives (Representative Barney Quilter) and two members of the Ohio Senate (Senators Grace Drake and Charles Henry).   This case involves the constitutionally mandated decennial apportionment of the state of Ohio to be undertaken in the year 1991.

The plaintiffs, and defendants Auditor of State and Representative Quilter, are all of the persons designated, by Section 1, Article XI of the Ohio

Constitution, to be responsible for a plan for the mandated apportionment. Jointly, these persons constitute the "Apportionment Board." Plaintiffs are a majority of the board. A plan was presented to the board and was, by a split vote, adopted by the board. In this action, plaintiffs seek a declaration, from this court, that the plan, as approved by the board, is valid in all respects.

Defendants Auditor of State and Representative Quilter caused the case to be removed to federal district court. In the federal court, the Auditor of State and Representative Quilter filed answers and counterclaims. Subsequently, the federal district court held that (1) it did not have subject matter jurisdiction and, pursuant to Section 1447(c), Title 28, U.S. Code, the case should be remanded to this court; (2) there was no "controversy" under Article III of the Constitution of the United States; and (3) plaintiffs lacked "standing" to bring the action. The district court then remanded the case to this court.

After remand, plaintiffs filed several motions, including a motion to amend their complaint. The latter motion was granted. Defendants Auditor of State and Representative Quilter filed a notice of withdrawal of their answers and counterclaims which they had filed in the federal district court. Thus, on behalf of *these* defendants, no counterclaims are pending.

Senators Drake and Henry, also defendants, filed answers and counterclaims on November 25, 1991. Defendant Henry contends that it is an uncontroverted fact that the 32nd Senate District (the district represented by Senator Henry) does not contain the minimum population mandated by Section 4, Article XI of the Ohio Constitution. Therefore, contends Senator Henry, the apportionment plan is unconstitutional.

Senator Drake, in her counterclaim, simply contends that her interest in the action arises only if the composition of the 32nd district is held unconstitutional. The senator contends that such a finding could result in population being transferred from her district (22nd) to the 32nd district. Only then would Senator Drake have a claim.

Following remand of the case to this court by the federal district court, evidence and a number of pleadings and motions were filed. Included were motions by the Auditor of State, Attorney General and Representative Quilter to dismiss plaintiffs' complaint. On January 13, 1992, we issued two orders. The first order (Moyer, C.J., Holmes and Douglas, JJ., and Judge Milligan in the majority) overruled the motions to dismiss plaintiffs' amended complaint. The second order (Sweeney, Douglas, Brown and Resnick, JJ., in the majority) permitted the Auditor of State, Attorney General and Representative Quilter to file answers and counterclaims to the amended complaint by January 27, 1992. The second order also directed the parties to brief the issue, on or before January 27, 1992, as to whether the pending counterclaims could

properly survive if there were a dismissal of the plaintiffs' complaint. Chief Justice Moyer, Justice Holmes and Judge Milligan dissented as to the second order on the basis that plaintiffs had standing and no further briefing was necessary. I disagreed with their conclusion then and continue to do so based upon the reasons more fully set forth *infra*.

As ordered, the parties filed briefs on the counterclaim issue. Defendants Auditor of State, Attorney General and Representative Quilter filed answers but did not file counterclaims. The cause is now before us for decision.

## I

Defendants Auditor of State and Representative Quilter filed in this court a notice of withdrawal of their counterclaims filed in the federal court after removal to that court. If those counterclaims are even properly pending in this court, certainly the Auditor of State and Representative Quilter are in control of their actions and have a right to withdraw those pleadings.

This leaves pending before the court the plaintiffs' amended complaint, the answers of the Auditor of State, Attorney General and Representative Quilter, and the answers and counterclaims of defendants Senators Drake and Henry.

## II

### *Plaintiffs' Complaint*

Plaintiffs have asked this court to place our blessing on the plan of apportionment promulgated and passed by them. They do so by bringing an action for declaratory judgment and, in actual effect, seek an advisory opinion. It is clearly understandable that they do so, given the uncertainty of the apportionment process, the strict time deadlines for candidate filing, the primary election date, and the inevitable political machinations and vicissitudes of each decennial apportionment.

I recognize plaintiffs' argument that Section 13, Article XI of the Ohio Constitution gives this court exclusive original jurisdiction over apportionment cases. This presupposes, I believe, that a case is *properly* brought to this court and that some party questions the constitutionality of the plan. After all, if we did nothing with plaintiffs' complaint and simply dismissed it for lack of jurisdiction, the plan would still remain in effect and would continue so, unless and until some party brought an action before us seeking a ruling that the plan was unconstitutional—and we found it to be so.

Notwithstanding the foregoing, I accept that we have jurisdiction on the basis that that is what Section 13 seems to say and there really is no other forum for litigants to bring an action in apportionment matters. Further, as

explained *infra,* I believe the jurisdiction of this court has properly been invoked by one of the filed counterclaims.

The issues of advisory opinions and declaratory judgment need very little discussion. It is well settled that this court will not indulge in advisory opinions. *Egan v. National Distillers & Chemical Corp.* (1986), 25 Ohio St.3d 176, 25 OBR 243, 495 N.E.2d 904, syllabus. Further, we have said " * * * that courts of appeals have no jurisdiction to hear declaratory judgment actions because that would extend their constitutionally declared jurisdiction over original actions. The same reasoning applies to this court whose constitutional jurisdiction over original actions is the same except for matters involving government of the bar." *State, ex rel. Coyne, v. Todia* (1989), 45 Ohio St.3d 232, 237, 543 N.E.2d 1271, 1276.

While these are compelling matters, I have greater concern with two other issues. It is my belief that plaintiffs' amended complaint poses no real and present controversy to be adjudicated and that the plaintiffs lack standing to bring this action.

One of the elements necessary for a declaratory judgment action to lie is that a real, justiciable controversy exists between adverse parties. *American Life & Accident Ins. Co. of Ky. v. Jones* (1949), 152 Ohio St. 287, 40 O.O. 326, 89 N.E.2d 301, paragraph two of the syllabus. There must be an actual controversy " * * * 'between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' * * * " *Peltz v. South Euclid* (1967), 11 Ohio St.2d 128, 131, 40 O.O.2d 129, 131, 228 N.E.2d 320, 323. See, also, *Burger Brewing Co. v. Liquor Control Comm.* (1973), 34 Ohio St.2d 93, 63 O.O.2d 149, 296 N.E.2d 261.

Plaintiffs have no real quarrel with the defendants other than the obvious political wrangle. With the exception of defendant Henry and possibly defendant Drake, none of the plaintiffs or defendants has any real stake in the outcome. In real terms, neither a win nor a loss materially affects the Governor, the Secretary of State, the Auditor of State or the Attorney General. Unless there is substantial overreaching in an attempt to make it so, this is also true of the President of the Senate and Representative Quilter who, in their individual capacities, do not allege and are clearly unlikely to suffer detriment no matter what the outcome of the case.

Thus, not only is there no real controversy between the parties, but plaintiffs also lack standing to bring this action. Civ.R. 17(A) provides, in part, that "[e]very action shall be prosecuted in the name of the real party in interest. * * * " We discussed, in some detail, the "real party in interest" question in *Shealy v. Campbell* (1985), 20 Ohio St.3d 23, 20 OBR 210, 485 N.E.2d 701. Therein, at 24, 20 OBR at 211, 485 N.E.2d at 702, we said that

"[a] 'real party in interest' has been defined as ' * * * one who has a real interest in the subject matter of the litigation, and not merely an interest in the action itself, *i.e.*, one who is *directly* benefitted or injured by the outcome of the case. * * * ' " (Citations omitted and emphasis *sic.*) Standing depends upon whether a complaining party has alleged such a personal stake in the outcome of the action that the adjudication sought will be in an adversarial context. *State, ex rel. Dallman, v. Court of Common Pleas* (1973), 35 Ohio St.2d 176, 178–179, 64 O.O.2d 103, 105, 298 N.E.2d 515, 516–517.

The elements for a "case or controversy" and/or "standing" are lacking here. No legal rights of plaintiffs hinge on the outcome of this case and plaintiffs do not allege that any of their legal rights or interests are adverse to those of defendants.

For the foregoing reasons, I would dismiss plaintiffs' complaint. This then removes from the case all of the plaintiffs and each of their assertions and requests. Thus, their contentions need not be addressed.

### III

### *Defendants: Auditor of State, Attorney General and Representative Quilter*

These defendants have each filed answers to plaintiffs' amended complaint, but no counterclaims pursuant to our order of January 13, 1992. Accordingly, when plaintiffs' complaint is dismissed the answers of these defendants, by operation of law, fall by the wayside.

It should also be added that defendants, on the basis of "collateral estoppel" (or "issue preclusion") and/or "res judicata" (or "claim preclusion"), may not properly again approach these questions in this court, despite the suggestion to the contrary by the dissenters. "Issue preclusion" forecloses relitigation of a matter of fact or law where there is a prior judgment in a case wherein the issues have been litigated and decided and where at least one of the parties or a privy was involved. "Claim preclusion" is where a court of competent jurisdiction renders a final judgment on the merits of a case and, thereby, bars the same parties or their privies from relitigating issues that were raised *or could have been raised* in the prior case.

Clearly, the parties herein or any other person who might be affected by the apportionment plan approved by the board have had their opportunity to make their claim(s) in this action. Having not done so by claim, counterclaim or intervention as of right (see Civ.R. 22 and 24) they would now be barred.

Likewise, it seems to me, this would also be the case as to the review of our decision by a federal court other than the United States Supreme Court. In

headnote one of *Rooker v. Fidelity Trust Co.* (1923), 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362, it is stated that "[w]here a judgment has been rendered, after due hearing, by a state trial court, with jurisdiction of the subject matter and parties, and affirmed by the state Supreme Court, the only resort under the legislation of Congress, for correction of errors in deciding questions involving the Constitution, is to the appellate jurisdiction of *this* Court." (Emphasis added.) In *District of Columbia Ct. of Appeals v. Feldman* (1983), 460 U.S. 462, 482, 103 S.Ct. 1303, 1315, 75 L.Ed.2d 206, 222, the United States Supreme Court said, " * * * as we have noted, * * * a United States District Court has *no* authority to review final judgments of a state court in judicial proceedings. Review of such judgments *may be had only in this Court.* * * * " (Emphasis added.)

This so-called Rooker–Feldman doctrine was well explained by the court in *Lemon v. Tucker* (N.D.Ill.1987), 664 F.Supp. 1143, 1148:

"The Rooker–Feldman doctrine holds that federal appellate review of judgments rendered by state courts can only occur in the Supreme Court, by appeal or by writ of certiorari. *Feldman*, 460 U.S. at 482, 103 S.Ct. at 1314–15 [75 L.Ed.2d at 222]; *Rooker*, 263 U.S. at 416, 44 S.Ct. at 150 [68 L.Ed. at 365]. Under this doctrine, a federal district court challenge to the correctness of a state court judgment must be dismissed for lack of subject matter jurisdiction. This doctrine applies even where the federal action seeks to challenge the procedures by which the state court rendered its judgment, so long as the constitutional claims presented to the federal court are 'inextricably intertwined' with the merits of the state court judgment. *Feldman*, 460 U.S. at 483–84 n. 16, 103 S.Ct. at 1315 n. 16 [75 L.Ed.2d at 223 n. 16.] In such a case, the federal district court is in essence being called upon to review a state court judgment. 'This it may not do.' "

At least six justices of this court have now found, for varying reasons, that we have jurisdiction over the subject matter and the parties in this case. Each of the parties has had an opportunity to present to the court any claim a party might have. We have now made a final decision. Parties and their privies are bound by that decision and it is not reviewable except by the United States Supreme Court.

## IV

### *Counterclaims of Senators Drake and Henry*

In our January 13, 1992 order, we ordered the parties to submit briefs on the question of whether the counterclaims filed herein would survive for adjudication even if plaintiffs' underlying complaint were dismissed. Several of my learned colleagues voted against that order on the basis that plaintiffs

had standing, that time was of the essence and that further briefing was not necessary. I voted with the majority of the court to require the additional briefing. Given today's majority holding and the concurring and dissenting opinions, the reason for my vote should now be obvious. The additional briefing has been very helpful, at least to me, in working through the difficult questions presented by this case.

While it is true that defendants Auditor of State, Attorney General and Representative Quilter contend, for various reasons, that the counterclaims of Senators Drake and Henry are not valid counterclaims, it is also true that all parties briefing the issue now agree that our Rules of Civil Procedure support the proposition that the counterclaims (if valid) may be heard by the court even if plaintiffs' complaint is dismissed. For the reasons which follow, I agree with that determination.

Civ.R. 42(B) provides that "[t]he court *after a hearing*, in furtherance of convenience or to avoid prejudice, or where separate trials will be conducive to expedition and economy, *may order a separate trial* of any claim, cross-claim, *counterclaim*, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, or third-party claims, or issues, always preserving inviolate the right to trial by jury." (Emphasis added.) Civ.R. 13(I) provides that *"[i]f the court orders separate trials as provided in Rule 42(B), judgment on a counterclaim* or cross-claim *may be rendered* in accordance with the terms of Rule 54(B) when the court has jurisdiction so to do, *even if the claims of the opposing party have been dismissed* or otherwise disposed of." (Emphasis added.)

Civ.R. 42(B) requires a hearing. We now have had the issue briefed and the court has heard it. We now have, in effect, ordered a separate trial of the counterclaims and have proceeded to determine the merits of the counter-claims.

## V

### *Counterclaim of Senator Drake*

Senator Drake contends that her interest in this case arises only in the event that the composition of the 32nd District is declared unconstitutional. The senator's reasoning is that, in such event, population could be transferred from her district (the 22nd) to the 32nd District. I find Senator Drake's interest to be speculative, at best, especially given my ultimate conclusion herein. Accordingly, I believe that Senator Drake lacks standing to assert a counterclaim and I would, therefore, dismiss her claim.

## VI

### *Counterclaim of Senator Henry*

Several questions arise as to the validity of Senator Henry's counterclaim. First, there is the question of standing. Senator Henry's counterclaim was brought in both his official capacity as the Senator of the 32nd District and as an elector of the district. The federal district court, in remanding this case to us, pointed out that electors have, historically, been deemed the proper plaintiffs to bring challenges to apportionment. Since Senator Henry is both an elector and the representative of the 32nd District, he has standing in both capacities to assert his counterclaim. A question could be raised, by someone at sometime, as to Senator Henry's right to represent an underpopulated district. This potential issue should now be settled.

Second, is there a case or controversy? It is not disputed that the 32nd District, as set forth in the apportionment plan, violates Section 4 of Article XI of the Ohio Constitution in that the district is underpopulated. This, at least facially, sets up a claim of unconstitutionality in that the proposed district deviates from a constitutional requirement. There is a real controversy and Senator Henry has a stake in the outcome.

Third, given that the plaintiffs and defendants are dismissed from the action, who is left to be an adverse party to Senator Henry? Civ.R. 21 provides, in part, that "[m]isjoinder of parties is not ground for dismissal of an action. *Parties may be* dropped or *added by order of the court on* motion of any party or of *its own initiative at any stage of the action* and on such terms as are just. * * * " (Emphasis added.) The Governor, the Secretary of State, the Auditor of State, the President of the Senate and Representative Quilter are the persons, under Article XI of the Ohio Constitution, responsible for apportionment. I would order, pursuant to Civ.R. 21, that the members of the Apportionment Board be made and joined parties defendant. See, also, Civ.R. 20(A).

Senator Henry has properly asserted a viable counterclaim. It stands on its own and can and should be preserved in accordance with Civ.R. 42(B). Senator Henry is entitled to an adjudication of his counterclaim. All the information and evidence necessary to do so is before the court as are, as well, the proper parties.

## VII

With the foregoing discussion in mind, the sole issue remaining in this case is whether the 1991 apportionment plan is constitutional with respect to the composition of the 32nd Senate District. In this regard, the information

before us demonstrates that the 32nd Senate District does not meet the minimum population requirement of Section 4, Article XI of the Ohio Constitution which provides as follows:

"The population of each senate district shall be substantially equal to the ratio of representation in the senate, as provided in section 2 of this Article, *and in no event shall any senate district contain a population of less than ninety-five per cent nor more that one hundred five per cent of the ratio of representation in the senate as determined pursuant to this Article.*" (Emphasis added.)

However, the evidence before us also indicates that correcting the Section 4 violation as it pertains to the 32nd Senate District under the current plan would result in a violation of Section 11, Article XI and possibly a violation of Section 8, Article XI of the Ohio Constitution. Section 11, Article XI provides, in part, that:

"Senate districts shall be composed of three contiguous house of representatives districts. A county having at least one whole senate ratio of representation shall have as many senate districts wholly within the boundaries of the county as it has whole senate ratios of representation. Any fraction of the population in excess of a whole ratio shall be a part of only one adjoining senate district. *Counties having less than one senate ratio of representation, but at least one house of representatives ratio of representation shall be part of only one senate district.* * * *" (Emphasis added.)

The "in no event" language of Section 4, Article XI is clear and mandatory. The "only one" language of Section 11, Article XI is equally clear and mandatory. Neither Section 4 nor Section 11 indicates which provision is to yield in the event of an irreconcilable conflict between the two provisions. In my judgment, Sections 4 and 11 are of equal import in the Article XI apportionment scheme. The Section 4 "in no event" language and the Section 11 "only one" language are of corresponding significance.

Accordingly, I believe that the issue in this case places this court in the position of having to decide which of these coequal provisions (Sections 4 and 11) must yield with respect to the composition of the 32nd Senate District under the published apportionment plan.

Pursuant to Section 1, Article XI of the Ohio Constitution, the *Apportionment Board,* not this court, is obligated to devise an apportionment scheme for the state of Ohio. For this court to correct the violation of Section 4 with respect to the composition of the 32nd Senate District under the plan adopted by a majority of the board would necessitate a violation of Section 11. Under these circumstances, the board's decision as to the composition of the 32nd Senate District should remain undisturbed. Furthermore, the board's decision

to comply with Section 11 makes good sense. Noncompliance with Section 11 under an apportionment plan is a matter which could not be corrected until the next decennial apportionment whereas the matter concerning minimum population in Section 4 is a matter which could potentially correct itself with an increase in population in the geographic area of the 32nd Senate District.

For the foregoing reasons, I would find Senator Henry's counterclaim of unconstitutionality to be not well taken. I would declare that the composition of the 32nd Senate District is constitutionally permissible for the reasons stated. Since that issue is the only one concerning the constitutionality of the apportionment plan which has been properly presented to us, I would declare that the plan is constitutionally permissible. I would return the matter to the Apportionment Board with instructions to make the necessary technical corrections in accordance with plaintiffs' Exhibit 13.

MILLIGAN, J., concurs in the foregoing concurring opinion.

SWEENEY, J., dissenting. In my view, the parties lack standing to bring this action and, therefore, I believe the cause should be dismissed. Any opinion emanating from this court on the merits of this so-called controversy would be purely advisory and should not be sanctioned by this court. In addition, I believe this court has done a grave disservice to all concerned by issuing multiple result-oriented opinions in support of a non-substantive entry without the benefit of oral argument. Even assuming that standing is not an issue, this court has eliminated a most valuable tool for determining the merit of the various arguments raised by the parties.

Nevertheless, assuming *arguendo*, that the parties do have proper standing to bring this action, I would concur in the well-reasoned and cogent analysis articulated by Justice Resnick in her dissenting opinion.

ALICE ROBIE RESNICK, J., dissenting. The *per curiam* opinion issued in this case is misleading and at best incomplete. The *per curiam* opinion issued by this court fails to address the main issue raised in plaintiffs' action. Plaintiffs have asked this court to issue a declaratory judgment that the apportionment plan is constitutional. This complaint for declaratory judgment of necessity means that the merits of that suit are properly before this court and should be addressed. It is our duty and responsibility to give answers to the constitutional issues the plaintiffs have raised. Therefore, I see no reason to limit consideration of the issues in this case to one issue raised by one counterclaim, and I respectfully dissent.

I am unwilling to sit by and allow false impressions to be raised by my silence. The majority's result has its foundation in legal gymnastics. The majority has, through incomprehensible maneuvering, reached a politically motivated result. When the majority realized that the merits of the case did

not dictate the desired result, the main constitutional question was suddenly of minor importance. The majority searched far and wide through all issues in this case, found one issue it could agree on—the one raised in Senator Henry's counterclaim—and magically brushed aside all other issues.

While I firmly believe that the majority has reached the wrong result on the one issue it does address, I can not countenance its refusal to consider this case squarely on its merits. If the plaintiffs have standing, as one of the concurring justices concluded, how can the merits of the entire controversy not be before this court? Justice Holmes, in his concurring opinion, recognizes this fact and does fully reach the merits. While I disagree with his reasoning and result, his approach is at least legally defensible.

On the other hand, if the plaintiffs do not have standing, how can either claim preclusion or issue preclusion apply to the facts of this case? The height of result-oriented absurdity is suggested by one of the concurring justices, who states: "Parties and their privies are bound by that decision and it is not reviewable except by the United States Supreme Court." It is utter hypocrisy to evade the constitutional issue presented to us, to resolve the case on minor questions presented in one counterclaim, and to then declare the entire apportionment plan constitutional and binding unless the United States Supreme Court rules otherwise. The United States Supreme Court is reluctant to interpret a state constitution. Yet, by this hocus-pocus, the merit decision on *Ohio* constitutional issues is accomplished by a process of non-adjudication.

This court, in an attempt to reach a speedy resolution of this controversy, has undertaken the task of issuing a decision without benefit of oral argument. The rationale used to justify the rush to render a ruling is that the parties need guidance. Yet the majority avoids the principal issue which the plaintiffs sought to have resolved, that is, the constitutionality of the apportionment plan. Worse, the majority gives the false message, by deciding only the issue raised in defendant Henry's counterclaim, that the plan otherwise complies with the mandates of Article XI of the Ohio Constitution.

Quite to the contrary, the apportionment plan in fact is riddled with violations of the Ohio Constitution, violations which the majority does not address, and therefore, does not acknowledge. The plan, because it is replete with constitutional defects, should be redrawn. To do as the majority has, and give the green light to implementation of the faulty plan, makes extensive future litigation inevitable. The majority's approach denies the plaintiffs the very guidance they seek. The citizens of this state deserve a timely and thorough decision on the merits of this case. Although the two goals of speed

and accuracy are not entirely compatible, I feel we should at this time issue a decision on the merits.

Proceeding now to a consideration of the merits of the case, attention is directed to paragraph thirty-nine of plaintiffs' amended complaint, wherein plaintiffs specifically request the court to construe Sections 3, 4, 7, 8, 9, 10, and 11 of Article XI and find that "[t]he Apportionment Plan, adopted by Plaintiffs and attached as Exhibit A, conforms in all respects to Article XI of the Ohio Constitution and is valid and lawful." After examining these sections and their interrelationships, it is clear that the apportionment plan as adopted is invalid and unlawful in part.

## I. Preliminary Matters

### A. Jurisdiction

Defendants Fisher, Ferguson and Quilter attack the jurisdiction of this court to hear this action. However, this court does in fact have jurisdiction over the subject matter, and this case does present a justiciable controversy.

Section 13 of Article XI of the Ohio Constitution provides in part that "[t]he supreme court of Ohio shall have exclusive, original jurisdiction in all cases arising under this Article. * * *" This original action is for a declaratory judgment. This court has previously stated that we have no original jurisdiction in declaratory judgment. *State, ex rel. Coyne, v. Todia* (1989), 45 Ohio St.3d 232, 237, 543 N.E.2d 1271, 1276; *Christensen v. Bd. of Commrs. on Grievances and Discipline* (1991), 61 Ohio St.3d 534, 537, 575 N.E.2d 790, 792. However, those cases considered only our original jurisdiction under Section 2(B)(1), Article IV of the Ohio Constitution, which is limited to extraordinary writs, any cause on review as may be necessary to complete our determination, and matters affecting the governance of the bar. Our jurisdiction under Section 13, Article XI is broader, extending to "all cases" arising under that article.

In *State, ex rel. Foreman, v. Bellefontaine Mun. Court* (1967), 12 Ohio St.2d 26, 28, 41 O.O.2d 159, 159–160, 231 N.E.2d 70, 71, we held:

"Statutes which create a declaratory judgment procedure do not extend the jurisdiction of the subject matter of a court but rather extend the power of the court to grant declaratory relief within its respective jurisdiction. In other words, declaratory judgment statutes provide an additional remedy which may be granted by a court but they do not extend the jurisdiction as to the subject matter upon which a court may act. * * *" (Citations omitted.)

R.C. 2721.02 authorizes "[c]ourts of record" to grant declaratory judgments. This court is a court of record. Therefore, our jurisdiction to hear all cases under Article XI is complemented by the authority to grant declaratory

judgments under R.C. 2721.02 and, to this extent, we may grant declaratory judgments.

## B. Justiciable Controversy

Defendants Fisher, Ferguson, and Quilter also renew the argument that plaintiffs present no justiciable controversy. In *Burger Brewing Co. v. Liquor Control Comm.* (1973), 34 Ohio St.2d 93, 63 O.O.2d 149, 296 N.E.2d 261, we stated in paragraph one of the syllabus:

"An action for a declaratory judgment * * * may be entertained by a court, in the exercise of its sound discretion, where the action is within the spirit of the Declaratory Judgment Act, a justiciable controversy exists between adverse parties, and speedy relief is necessary to the preservation of rights which may otherwise be impaired or lost. (Paragraph two of the syllabus in *American Life & Accident Ins. Co. v. Jones*, 152 Ohio St. 287 [40 O.O. 326, 89 N.E.2d 301], followed.)"

A "justiciable controversy" is a "real" or "actual" controversy. In *Burger Brewing Co., supra,* we continued:

"For a real controversy to exist it is not necessary that the plaintiffs violate the regulation, as long as there is a controversy ' "between parties having adverse legal interests, of *sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." ' (Emphasis added.) *Peltz v. South Euclid, supra* [11 Ohio St.2d], at page 131 [40 O.O.2d at page 131, 228 N.E.2d at page 323]. * * *

"To aid in the determination whether a controversy 'is justiciable in character' or there is the 'ripeness' necessary for review, United States Supreme Court Justice Harlan, in *Toilet Goods Assn. v. Gardner* (1967), 387 U.S. 158, 162 [87 S.Ct. 1520, 1523, 18 L.Ed.2d 697, 701], developed a two-fold test:

" ' * * * first to determine whether the issues tendered are appropriate for judicial resolution, and second to assess the hardship to the parties if judicial relief is denied at that stage.' * * * " *Burger Brewing Co., supra,* 34 Ohio St.2d at 97, 63 O.O.2d at 151, 296 N.E.2d at 264.

Moreover, in *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 14, 51 O.O.2d 35, 35, 257 N.E.2d 371, 372, we stated:

"It has been long and well established that it is the duty of every judicial tribunal to decide actual controversies between parties legitimately affected by specific facts and to render judgments which can be carried into effect. It has become settled judicial responsibility for courts to refrain from giving opinions on abstract propositions and to avoid the imposition by judgment of premature declarations or advice upon potential controversies. * * * "

Plaintiffs present three concrete specific issues involving application of Sections 3, 4, 7, 8, 9, 10, and 11 of Article XI to the creation of house of representatives districts. Such issues are clearly appropriate for judicial resolution. Additionally, the hardship if relief is denied is made manifest by the approaching February 20, 1992 deadline to file petitions for election to the General Assembly. Moreover, although the apportionment plan had not been adopted and published when the original complaint was filed in this case, it was adopted on October 1, amended on October 1, amended on October 3, and published on October 5, 1991, before the amended complaint was filed. The issues presented are thus ripe for determination. Therefore, the complaint presents a real and actual controversy that is "justiciable in character."

## II. On the Merits

### A. Section 10, Article XI

Plaintiffs first argue that a proper understanding and construction of Section 10, Article XI is central to understanding the specific issues concerning it and Sections 3, 4, and 7. Section 10 states:

"The standards prescribed in sections 3, 7, 8, and 9 of this Article shall govern the establishment of house of representatives districts, which shall be created and numbered in the following order to the extent that such order is consistent with the foregoing standards:

"(A) Each county containing population substantially equal to one ratio of representation in the house of representatives,[1] as provided in section 2 of this Article, but in no event less than ninety-five per cent of the ratio nor more than one hundred five per cent of the ratio shall be designated a representative district.

"(B) Each county containing population between ninety and ninety-five per cent of the ratio or between one hundred five and one hundred ten per cent of the ratio may be designated a representative district.

"(C) Proceeding in succession from the largest to the smallest, each remaining county containing more than one whole ratio of representation shall be divided into house of representatives districts. Any remaining territory within such county containing a fraction of one whole ratio of representation shall be included in one representative district by combining it with adjoining territory outside the county.

---

1. A house ratio of representation is 109,567 persons, the total population of the state divided by 99, the number of house districts. A senate ratio of representation is the total population of the state divided by 33, the number of senate districts. See Section 2 of Article XI, Ohio Constitution.

"(D) The remaining territory of the state shall be combined into representative districts." (Footnote added.)

Plaintiffs explain that they first named as single house districts counties that qualified under Section 10(A), and second, those that qualified under Section 10(B). They then followed Section 10(C), proceeding from the most populous to the least populous county entitled to one or more districts. They emphasize the second sentence of Section 10(C), contending that it requires any population remaining after house districts wholly within a county are created to be joined with territory from an adjoining county to form a district *before* proceeding to the next smaller county.

Finally, plaintiffs argue that Section 10(D) necessarily applies only to counties with less than one whole house ratio of representation which, therefore, do not qualify to be single-county house districts under Sections 10(A) and 10(B).

Plaintiffs' construction of Section 10 is flawed. Initially, there is no basis for according it the primacy that plaintiffs obviously did in constructing the adopted plan. The preamble of Section 10 clearly shows that it is a procedural section for the ordering and numbering of house districts and that its procedural requirements are secondary to the substantive requirements of Sections 3, 7, 8, and 9 (and additionally Sections 4 and 11), all of which are hereby described in outline [2]:

---

2. Section 3 of Article XI states:

"The population of each house of representatives district shall be substantially equal to the ratio of representation in the house of representatives, as provided in section 2 of this Article, and in no event shall any house of representatives district contain a population of less than ninety-five per cent nor more than one hundred five per cent of the ratio of representation in the house of representatives, except in those instances where reasonable effort is made to avoid dividing a county in accordance with section 9 of this Article."

Section 4 of Article XI states:

"The population of each senate district shall be substantially equal to the ratio of representation in the senate, as provided in section 2 of this Article, and in no event shall any senate district contain a population of less than ninety-five per cent nor more than one hundred five per cent of the ratio of representation in the senate as determined pursuant to this Article."

Section 7 of Article XI states:

"(A) Every house of representatives district shall be compact and composed of contiguous territory, and the boundary of each district shall be a single nonintersecting continuous line. To the extent consistent with the requirements of section 3 of this Article, the boundary lines of districts shall be so drawn as to delineate an area containing one or more whole counties.

"(B) Where the requirements of section 3 of this Article cannot feasibly be attained by forming a district from a whole county or counties, such district shall be formed by combining the areas of governmental units giving preference in the order named to counties, townships, municipalities, and city wards.

"(C) Where the requirements of section 3 of this Article cannot feasibly be attained by combining the areas of governmental units as prescribed in division (B) of this section, only one

(1)(a): Section 3 requires house districts to be substantially equal to a house ratio of representation and provides that "in no event" shall the population of a district be less than ninety-five percent or more than one hundred five percent of a house ratio, permitting an exception only for single-county house districts established under Section 9 in counties having ninety to ninety-five percent or one hundred five to one hundred ten percent of a house ratio of representation.

(b): Similarly, Section 4 of Article XI, although not mentioned in Section 10, requires that senate districts shall "in no event" be less than ninety-five or more than one hundred five percent of a senate ratio of representation, without exception.

(2)(a): Sections 7(A), (B), and (C) require creating house districts from one or more whole counties where possible, then from certain combined whole governmental units, and as a last resort by dividing only one such governmen-

---

such unit may be divided between two districts, giving preference in the selection of a unit for division to a township, a city ward, and a village in the order named.

"(D) In making a new apportionment, district boundaries established by the preceding apportionment shall be adopted to the extent reasonably consistent with the requirements of section 3 of this Article."

Section 8 of Article XI states:

"A county having at least one house of representatives ratio of representation shall have as many house of representatives districts wholly within the boundaries of the county as it has whole ratios of representation. Any fraction of the population in excess of a whole ratio shall be a part of only one adjoining house of representatives district.

"The number of whole ratios of representation for a county shall be determined by dividing the population of the county by the ratio of representation for the house of representatives determined under section 2 of this Article."

Section 9 of Article XI states:

"In those instances where the population of a county is not less than ninety per cent nor more than one hundred ten per cent of the ratio of representation in the house of representatives, reasonable effort shall be made to create a house of representatives district consisting of the whole county."

Section 11 of Article XI states:

"Senate districts shall be composed of three contiguous house of representatives districts. A county having at least one whole senate ratio of representation shall have as many senate districts wholly within the boundaries of the county as it has whole senate ratios of representation. Any fraction of the population in excess of a whole ratio shall be a part of only one adjoining senate district. Counties having less than one senate ratio of representation, but at least one house of representatives ratio of representation shall be part of only one senate district.

"The number of whole ratios of representation for a county shall be determined by dividing the population of the county by the ratio of representation in the senate determined under section 2 of this Article.

"Senate districts shall be numbered from one through thirty-three and as provided in section 12 of this Article."

tal unit between two districts. These sections are expressly subordinated to Section 3's population requirements and to each other in descending order.

(b): Section 7(D) requires prior districts (from 1981 in this case) to be retained, "to the extent reasonably consistent with the requirements of section 3 * * *." Contrary to statements made by plaintiffs, Section 7(D) is not subordinated to Sections 7(A), (B), and (C).

(c): Section 8 requires each county containing at least one house ratio of representation to contain as many wholly internal house districts as it has whole house ratios of representation, and requires that any remainder population be part of only one adjoining house district. Section 8 is not expressly subordinated to any other section; however, in order to give meaning to the "in no event" language of Sections 3 and 4, it must be subordinate to those sections.

(d): Although not mentioned in Section 10, which pertains only to the order of creation and numbering of house districts, Section 11 requires senate districts to be composed of three contiguous house districts, requires counties containing at least one whole senate ratio of representation to have as many senate districts wholly within the county as the county has whole senate ratios of representation, requires any remainder population to be part of only one adjoining senate district, and requires that counties having less than one senate ratio of representation, but at least one house ratio of representation, to be part of only one senate district. Section 11 is not expressly subordinated to any other section, but it should be subordinated to Section 4 because of the latter's "in no event" language.

Thus, it is evident that the population requirements of Sections 3 and 4 must initially be considered in any construction of Article XI; that creation of a district under Section 9 is a desirable exception to Section 3, but is not mandatory; that Sections 7(A), (B), and (C), collectively, and Sections 7(D), 8, and 11 are of equivalent priority, but secondary to Sections 3 and 4; and that Section 10 is of lowest priority.

The *per curiam* opinion states that Sections 9 and 11 are coequal with Section 4. That conclusion is clearly wrong in light of Section 4's language that "in no event shall any senate district contain a population of less than ninety-five per cent * * * of the ratio of representation in the senate * * *." The plan should have been drawn to give effect to all relevant sections. If, however, conflict is unavoidable, Sections 9 and 11 must yield to Section 4.

Moreover, from the hierarchy of provisions outlined above, it follows that plaintiffs are not correct when they state that Section 10(C) must be strictly complied with even though it may interfere with the primary goals of population equality under Sections 3 and 4, and the secondary goals of

creating districts from whole counties and preserving prior districts under Sections 7(A) and 7(D).

The reference in 10(C) to *"count[ies]* containing more than one whole ratio of representation" does not refer to counties with more population than one ratio of representation, but to counties with more whole ratios than one. This means two or more whole ratios. Hence, counties containing one but less than two whole ratios should be ordered and numbered under Section 10(D)'s remainder category. In any case, Sections 10(C) and 10(D) must be treated as flexible concepts to be dispensed with if necessary to achieve the substantive requirements of Sections 3, 4, 7, 8, 9, and 11.

Accordingly, the specific issues will be addressed from this construction of the hierarchy of Article XI and Section 10's place in it, rather than from the construction urged by plaintiffs.

## B.   Section 7(A) Violations

Plaintiffs contend that defendants Ferguson and Quilter have wrongly charged that the adopted plan fails to comply with Section 7(A) of Article XI, which states in part that, subject to the population requirements of Section 3, house district boundary lines shall be drawn "to delineate an area containing one or more, whole counties." Section 7(A) is fully understood only in the contexts of Sections 7(B) and (C).[3] Section 7(B) provides that where Section 3's population requirements cannot be attained by forming a district from whole counties under Section 7(A), districts may be formed by combining whole governmental units, giving preference to counties, townships, municipalities and city wards, in that order. Section 7(C) then provides that if Section 3's population requirements cannot be attained under Section 7(B), "only one" such governmental unit may be divided between two districts, giving preference for division in the following order: township, city ward, city and village.

Defendants argue that Section 7(A) requires the creation of as many house districts from whole counties as possible. They present evidence that the approved plan contains only eighteen whole counties in such districts, when it might have contained at least thirty-one, the number of such counties retained in whole county districts in the plan offered by the Democratic minority of the Apportionment Board.

Plaintiffs argue that Section 7(A) does not require the creation of districts of more than one whole county. They argue that the creation of whole counties is governed only by the provisions of Sections 10(A) and (B) for the

---

3.  See footnote 2 for the full text of Section 7.

ordering and numbering of single-county districts. They further argue that Sections 7(A) and 10 must be reconciled by relegating boundary drawing provisions of Section 7(A) to Section 10(D), which requires the creation of districts from remaining territories after single-county districts under Sections 10(A) and (B) and multidistrict counties under Section 10(C) have been created, and the remainder populations of the Section 10(C) counties have been attached to surrounding territory.

Plaintiffs' interpretation of Section 10 must be rejected. First, Section 7(A)'s reference to "one or more whole counties" clearly refutes the contention that it does not contemplate the creation of districts from two or more whole counties. Second, plaintiffs' relegation of Section 7(A)'s requirements to Section 10(D)'s remainder category again subordinates the former's substantive requirement to the latter's procedures, a construction rejected in Part IIA of this dissenting opinion.

Plaintiffs also contend that they have retained fifty-six whole counties in districts under the adopted plan. This is true, but not relevant to this issue. Plaintiffs are combining the count of whole-county districts (Section 7[A] districts) and the count of districts containing at least one whole county in combination with other governmental units (Section 7[B] districts). The question is whether, under Section 7, whole-county (7[A]) districts are to be preferred to 7(B) and (C) districts. The internal evidence from Section 7 confirms that they are.

Defendants Ferguson and Quilter present evidence that the Democratic plan used thirteen more counties in whole-county districts than did the adopted plan. This is not conclusive evidence since the defendants have not established the total validity of the Democratic plan. Nevertheless, the Democratic plan is some evidence that more whole-county districts could have been created.

Plaintiffs have raised this issue and requested the court to construe the various sections of Article XI and declare the adopted plan constitutional. However, they have failed to sustain their burden of proof.

## C. Section 7(D) Violations

Section 7(D), Article XI states:

"In making a new apportionment, district boundaries established by the preceding apportionment shall be adopted to the extent reasonably consistent with the requirements of section 3 of this Article."

Defendants state that, on the basis of internal population, forty-four house districts could have been retained under Section 7(D). However, their expert

witness acknowledges that external, adjacent population must also be taken into account when applying Section 7(D). Plaintiffs' expert concurs.

Plaintiffs argue that population shifts and the "implications of minority voting rights under the [federal] Voting Rights Act" made it impossible to retain more than seven prior districts. Moreover, plaintiffs' expert witness, commenting on defendants' model plan, stated that the plan violated Section 7(A) because it created districts without any whole county, and that it violated Section 10(C) by not creating a district combining the remainder population of a multidistrict county with territory outside the county *before* proceeding to the next multidistrict county.

Plaintiffs also maintain, citing evidence from both expert witnesses, that Section 8's requirements take precedence over Section 7(D).[4]

Defendants submit as evidence a model apportionment plan. This plan retains thirty-one of the forty-four eligible districts, more than either the adopted plan or the rejected Democratic plan.

Defendants' exhibit 17 represents that all ninety-nine house districts in the model plan contain the required Section 3 population except House District 5 (Fairfield County), which contains the required population to be a Section 9, single-county district. Exhibit 18 lists the forty-four 1981 districts eligible for retention in 1991 solely on the basis of internal population and the thirty-one districts the model plan retains. This latter group includes former districts 1, 3, 5, 6, 7, 10, 13, 17, 22, 29, 32, 39, 41, 42, 43, 44, 45, 46, 54, 62, 65, 79, 80, 81, 82, 89, 90, 91, 94, 95, and 96.

Again, this evidence is not conclusive because it presumes that the model plan conforms to the Constitution not only in regard to Section 7(D), but in all other respects. Nevertheless, it is entitled to some weight, and balancing it against plaintiffs' evidence and arguments on this issue, the model plan is entitled to greater weight on this issue.

First, plaintiffs argue that required compliance with the federal Voting Rights Act of 1965, Section 1973 *et seq.*, Title 42, U.S.Code, prevented them from retaining some prior districts by requiring them to create as many districts as possible where black voters could be in the majority. However, the January 31, 1992 order of the federal three-judge panel in *Quilter v. Voinovich* (pending), N.D.Ohio No. 5:91CV2219, concluded that there was no such legal mandate under the Voting Rights Act, and specifically removed this claim as a possible defense in state proceedings. Therefore, no weight can be accorded to plaintiffs' evidence or argument on this claim.

---

4. See footnote 2 for the full text of Section 8.

Second, plaintiffs' contention that some of the model plan's districts do not contain whole counties in violation of Section 7(A) is refuted by reference to Sections 7(B) and (C). Although Section 7(B) prefers inclusion of whole counties, it does not require it, and therefore does not preclude the creation of districts without whole counties.

Third, plaintiffs' contention that population shifts made retention of more than seven prior districts impossible is supported only by their expert witness's statement in his deposition. This assertion does not outweigh defendants' exhibit 17, which purports to retain thirty-one such districts with the constitutionally required ratio of representation.

Fourth, plaintiffs' evidence that the model plan violates Section 10(C) again misconstrues the relationship between Sections 7 and 10, by suggesting that Section 10(C) takes precedence over 7(D), an argument refuted *supra.*

Fifth, plaintiffs' assertion that Section 8's requirements prevented compliance with Section 7(D) is not supported by evidence. As stated in Part IIA, Sections 7(D) and 8 have equivalent status under Article XI. Before violating one to achieve compliance with the other, plaintiffs must clearly show that such conflict was unavoidable.

Accordingly, the approved plan does not comply with Section 7(D)'s requirements for the retention of prior districts. The plaintiffs should be required to redraw the plan in conformance with the proper construction of Sections 7, 8, and 10.

### D. Sections 3, 4, and 9

Plaintiffs admit that House District 68, which is made up of Geauga County and part of Trumbull County under the adopted plan, contains less than ninety-five percent of a house of representatives ratio of representation.

Plaintiffs explain the dilemma with the underpopulation of House District 68, as follows:

(1) The district is composed of Geauga County and the remainder of Trumbull County after creation of House Districts 66 and 67 in Trumbull.

(2) Population cannot be added to the district from adjoining Ashtabula County because that county has been designated a single-county district under Section 9, and is also a prior district to be preserved under Section 7(D).

(3) Trumbull County, which contains two house districts plus the remainder that is part of House District 68, must be within a single senate district pursuant to Section 11. Therefore, it cannot be combined with Mahoning or Portage Counties, which also must be in single senate districts under Section

11, nor can it be combined with Ashtabula County, which is a single-county district previously established.

(4) Territory from adjoining Cuyahoga County cannot be combined with House District 68, since the remainder population in Cuyahoga County is nearly ninety percent of a house ratio, which, if combined with Geauga County, would extend the house district population well beyond the one hundred five percent limit of Section 3.

(5) Therefore, the only alternative is to combine the Trumbull County remainder with Geauga County to form an underpopulated house district.

Similarly, plaintiffs argue that the underpopulation of Senate District 32, which is composed of House Districts 66, 67, and 68, is unavoidable and excusable because, as House District 68 must be excused from meeting population requirements of Section 3 of Article XI, so the senate district which contains that house district must also be excused from meeting the population requirements of Section 4 of Article XI.

Defendants Ferguson and Quilter argue that Section 3 permits deviation from its population requirements only to create a single-county district under Section 9, and that House District 68 does not come within that exception. Similarly, they argue that there is no exception from Section 4's population requirements for senate districts.

Defendant Henry also relies on the admitted facial violation of Sections 3 and 4.

Plaintiffs' argument is flawed in several respects. First, as stated above, Sections 3 and 4 state that *in no event* shall house and senate districts contain less than ninety-five percent or more than one hundred five percent of a ratio of representation, except when creating a single-county house district under Section 9. As stated in Part IIA, Sections 3 and 4 must be accorded the highest priority under Article XI.

Second, plaintiffs' insistence that House District 5, the single-county, Section 9 district of Ashtabula County, must be retained is not supported by law. Section 9 provides that "reasonable effort shall be made" to create such a district; it does not mandate creation of such a district. Further, Section 7(D) requires prior districts to be maintained, but only "to the extent reasonably consistent with the [population] requirements of section 3 * * *." These two provisions further suggest the primacy of Section 3's population require-ments. Accordingly, to resolve a Section 3 population problem, which both expert witnesses testified exists in northeastern Ohio, Ashtabula County may be divided.

Third, plaintiffs allege irreconcilable Section 11 complications. However, it is not clear that such complications would arise had plaintiffs correctly construed Section 10 and its interrelationship with and subordination to other sections farther back in the creation of the plan. Moreover, if a conflict between Section 11 and Sections 3 and 4 is unavoidable, Section 11 must yield.

It is impossible to tell, from the evidence submitted, how far the adopted plan should be reconstructed to achieve complete constitutional compliance with Sections 3 and 4. Plaintiffs have shown that there is a difficult situation in northeastern Ohio. However, they have chosen to violate the population provisions of Sections 3 and 4, which, according to the internal evidence of Article XI, should be granted the highest priority. Therefore, plaintiffs have not sustained the constitutionality of the plan on this issue, and they should be required to make changes to the plan by granting priority to Sections 3 and 4's population requirements. Judgment should be granted to defendant Henry on his counterclaim.

### E. Section 7(A)'s Contiguity Requirement

Plaintiffs do not raise the specific issues discussed in this and the following two subparts. However, since they have raised the general issue of the construction of Section 7 and supplied much evidence on these issues, these issues are also ripe for adjudication.

Defendants Ferguson and Quilter contend that the apportionment plan violates Section 7(A) of Article XI with respect to House District 26 in Franklin County. Section 7(A) states in part:

"Every house of representatives district shall be compact and composed of contiguous territory * * *."

Defendants state that precinct C of Blendon Township west of Westerville Pike is supposed to be in House District 26, yet a segment of that precinct west of Westerville Pike is totally surrounded by House Districts 21 and 25 and is therefore not contiguous to the rest of the territory of House District 26. Plaintiffs do not address this contention. However, in the document titled "Plaintiffs' Submission of Evidence," filed on November 25, 1991, plaintiffs state that "[t]he description for the assignment of Blendon Township in Franklin County is incorrect." Thus, plaintiffs seem to acknowledge the problem and should be required to make the correction.

### F. Section 7(B) Violations

Section 7(B) of Article XI requires that when a district cannot be formed from a whole county or counties, it must be formed by combining governmental units in the following order of preference: counties, townships, municipali-

ties, and city wards. Defendants contend that plaintiffs violated this provision by dividing the city of Mentor in Lake County between House Districts 69 and 70. Reference to the adopted plan confirms this division. Plaintiffs do not contest this on brief, and, in fact, in their list of technical corrections admit that the "City of Mentor should be assigned to House District 70." Therefore, the plan is invalid to this extent, and plaintiffs should be required to make the necessary correction.

### G. Section 7(C) Violations

#### 1. *Cuyahoga County*

Section 7(C) states that when Section 3's population requirements cannot be attained by combining governmental units under Section 7(B), "only one" such unit may be divided between two districts, giving preference in the selection of a unit for division in the following order: township, city ward, city, and village. Defendants first contend that a violation occurs in Cuyahoga County, where the city of Beachwood and villages of Orange and Oakwood are all divided between House Districts 11 and 15. Reference to the adopted plan confirms these divisions. Again, plaintiffs appear to admit the violation in their list of technical corrections, paragraph 10, where they state that all of Beachwood and Orange should be assigned to District 15. If this were done, the village of Oakwood would still be divided between the two house districts. Section 7(C) prefers the division of Beachwood, a city, before Oakwood, a village. Accordingly, plaintiffs should correct the plan in total conformity with Section 7(C).

Next, defendants contend that Section 7(C) is violated because Cleveland wards 19, 20, and 21 are divided between House Districts 17 and 19, and wards 17, 18, and 19 are divided between House Districts 13 and 17. Reference to the adopted plan confirms these divisions, and again, plaintiffs appear to admit the violations by stating that all of wards 17, 19 and 20 should be in House District 17. This would leave ward 18 divided between House Districts 13 and 17, and ward 21 divided between House Districts 17 and 19, which is permissible under Section 7(C). Again, plaintiffs should make these corrections.

#### 2. *Franklin County*

Defendants contend that wards 10, 31, 33, and 58 of the city of Columbus and Franklin Township in Franklin County are all divided between House Districts 23 and 28. The adopted plan confirms the allegation. Plaintiffs state in their list of technical corrections that wards 10 and 33 should be assigned to House District 28, and ward 31 should be assigned to House District 23. This would leave ward 58 and Franklin Township divided between

the two districts, which would still be a facial violation of Section 7(C). Plaintiffs should make the necessary corrections to comply fully with Section 7(C).

Next, defendants contend that Columbus wards 46 and 73 and Blendon, Jefferson, and Truro Townships in Franklin County are divided between House Districts 24 and 25. This is confirmed by reference to the description of the districts in the approved plan. Plaintiffs do not admit these violations in their list of technical corrections, and they also do not defend against this allegation on brief. Therefore, the greater weight of the evidence favors defendants on this issue. Accordingly, plaintiffs should correct the violation.

Next, defendants contend that Columbus wards 43, 52, 60 and 72, and Clinton, Perry, and Sharon Townships are divided between House Districts 26 and 27. Reference to the adopted plan confirms this. In their list of technical corrections, paragraph fourteen, plaintiffs state that ward 43 should be placed in House District 27 and wards 60 and 72 should be placed in House District 26. Even when accomplished, this would leave ward 52 and the three townships divided between the two districts, in apparent continuing violation of Section 7(C). Plaintiffs should be required to correct the violations in total conformity with Section 7(C).

Next, defendants argue that Columbus wards 10, 57, and 67 and Norwich and Prairie Townships are divided between House Districts 28 and "19" (*sic*, 29). Reference to the adopted plan confirms this. In their list of technical corrections, paragraphs thirteen and fifteen, plaintiffs state that wards 10 and 57 should be in House District 28 and ward 67 should be in House District 29. This would still leave the two townships split between the two house districts in apparent violation of Section 7(C). Again, plaintiffs should correct the violations to achieve total conformity with Section 7(C).

### 3. *Hamilton County*

Defendants contend that the cities of Forest Park and Mt. Healthy and Springfield Township are divided between House Districts 32 and 35 in Hamilton County. Reference to the adopted plan confirms this. In their list of corrections, paragraph 16, plaintiffs state that Forest Park should be in House District 32. This would still leave Mt. Healthy and Springfield Township split between the two house districts. Thus, there is a present violation of Section 7(C) and a potential continuing violation even if the technical correction is made. Plaintiffs should correct all violations in total conformity with Section 7(C).

Next, defendants contend that Cincinnati Ward 24 and Sycamore and Symmes Townships are divided between House Districts 32 and 36. Refer-

ence to the adopted plan confirms this. In their list of technical corrections, paragraph 17, plaintiffs state that the two townships should be placed in House District 36 and ward 24 should be split between House Districts 31 and 32. This would cure the violation alleged.

#### 4. *Summit County*

Defendants contend that Springfield Township and apparently Coventry Township (although defendants' brief fails to specify Coventry Township) are divided between House District 47 and 48. The assertion is correct, however, and plaintiffs' technical correction merely places precinct J of Coventry Township in House District 48 and precincts A and H in Springfield Township, which does not cure the violation. Accordingly, plaintiffs should comply fully with Section 7(C) and divide only one such governmental unit between the two districts.

#### 5. *Stark County*

Defendants contend that Plain and Perry Townships are divided between House Districts 54 and 55. The adopted plan confirms this. Plaintiffs have no technical correction; however, a violation exists and plaintiffs should conform the plan to Section 7(C) in this respect.

#### 6. *Lorain County*

Defendants contend that Ward 2 of Elyria and Carlisle Township are divided between House Districts 61 and 62. The adopted plan confirms this, and plaintiffs offer no technical correction. Plaintiffs should conform the plan to Section 7(C) in this respect.

### *Conclusion*

Having thus construed Article XI, I believe that judgment should be entered for defendant Henry on his counterclaim and that plaintiffs should be ordered to redraw the plan in conformity with the requirements of the Ohio Constitution, as set forth herein. The failure of the majority to address the significant constitutional questions presented by the apportionment plan proposed by plaintiffs is judicially irresponsible, since it makes needless future litigation inevitable.

H. BROWN, J., concurs in the foregoing dissenting opinion.