WILSON ET AL. *v.* KASICH, GOVERNOR, ET AL.

[Cite as *Wilson v. Kasich,* 134 Ohio St.3d 221, 2012-Ohio-5367.]

*Apportionment—The Ohio Constitution does not mandate political neutrality in the reapportionment of house and senate districts—Partisan considerations cannot prevail over the nonpartisan requirements set forth in Article XI—One challenging the constitutionality of an apportionment plan must establish that the plan is unconstitutional beyond a reasonable doubt—The Ohio Constitution, Article XI, Section 7(D) is coequal with Article XI, Sections 7(A), (B), and (C).*

(No. 2012-0019—Submitted April 24, 2012—Decided November 27, 2012.)

ORIGINAL ACTION filed pursuant to Ohio Constitution, Article XI, Section 13.

_____

**SYLLABUS OF THE COURT**

1. The Ohio Constitution does not mandate political neutrality in the reapportionment of house and senate districts, but partisan considerations cannot prevail over the nonpartisan requirements set forth in Article XI.

2. The burden of proof on one challenging the constitutionality of an apportionment plan is to establish that the plan is unconstitutional beyond a reasonable doubt. In the absence of evidence to the contrary, we presume that the apportionment board properly performed its duties in a lawful manner. (*State ex rel. Skaggs v. Brunner*, 120 Ohio St.3d 506, 2008-Ohio-6333, 900 N.E.2d 982, ¶ 51, and *State ex rel. Speeth v. Carney*, 163 Ohio St. 159, 186, 126 N.E.2d 449 (1955), applied).

3. When coequal provisions of Article XI of the Ohio Constitution are irreconcilable, the apportionment board has the duty to choose the proper course, and this court will not order it to correct one constitutional

violation by committing another. (*Voinovich v. Ferguson*, 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992), followed.)

4. The Ohio Constitution, Article XI, Section 7(D) is coequal with Article XI, Sections 7(A), (B), and (C), and the court will not order the apportionment board to correct a violation of Sections 7(A), (B), and (C) by violating Section 7(D).

_____

**O'DONNELL, J.**

{¶ 1} The Ohio Constitution provides for an apportionment board consisting of the "governor, auditor of state, secretary of state, one person chosen by the speaker of the house of representatives and the leader in the senate of the political party of which the speaker is a member, and one person chosen by the legislative leaders in the two houses of the major political party of which the speaker is not a member." Ohio Constitution, Article XI, Section 1. It further charges the board with the responsibility to draw the district boundaries, *id*., and vests the Ohio Supreme Court with "exclusive, original jurisdiction in all cases arising under this Article," *id*. at Section 13. Apportionment is "primarily a political and legislative process," *Gaffney v. Cummings*, 412 U.S. 735, 749, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), and as a result, both courts and scholars have universally agreed that politics cannot be divorced from the process.

{¶ 2} The issue we confront in this original action challenging the decennial apportionment of districts in the General Assembly is whether the plan adopted by the apportionment board complies with the Ohio Constitution, Article XI, Sections 7 and 11. Because relators failed to rebut the presumed constitutionality accorded the 2011 apportionment plan by establishing that the plan is unconstitutional beyond a reasonable doubt, we deny their request for declaratory and injunctive relief.

**Facts**

{¶ 3} The 2011 Ohio Apportionment Board consisted of respondents, Governor John Kasich, Auditor David Yost, Secretary of State Jon Husted, and Senate President Thomas Niehuas, who are members of the Republican Party, and House Minority Leader Armond Budish, a member of the Democratic Party. The board has the constitutional authority to apportion the districts for members of the General Assembly. Ohio Constitution, Article XI, Section 1.

{¶ 4} The board's joint secretaries prepared an apportionment plan and submitted it to the board. On September 28, 2011, the board voted four to one to approve an amended version of that plan, with the four Republican members of the board voting in favor and the lone Democratic member voting in opposition. On September 30, 2011, the board adopted another amendment to the secretaries' plan and approved the final plan with a four-to-zero vote, with respondents all voting in favor of the plan and the sole Democratic board member unable to attend the meeting.

{¶ 5} On January 4, 2012, relators, 36 electors living in various house districts as reapportioned by the Ohio Apportionment Board, filed this action under Article XI against respondents, four members of the apportionment board, but did not designate Armond Budish, the House Minority Leader, as a party. They primarily sought a declaration that the decennial apportionment plan adopted by respondents is invalid under Article XI and the Open Meetings Act and a prohibitory injunction preventing respondents from conducting elections using the state legislative districts set forth in the plan.

{¶ 6} Following the submission of responses, evidence, and briefs pursuant to a court-ordered accelerated schedule, on February 17, 2012, we dismissed relators' open-meetings claim for lack of subject-matter jurisdiction and denied relators' Article XI claims based on laches insofar as they attempted to challenge the use of the apportionment plan for the 2012 election cycle. *Wilson v.*

*Kasich*, 131 Ohio St.3d 249, 2012-Ohio-612, 963 N.E.2d 1282, ¶ 8 (O'Donnell, J., dissenting in part) (urging that the court has an obligation to review apportionment matters expeditiously and asserting that a piecemeal resolution permitting electors to vote when the underlying apportionment is under constitutional attack is ill-advised precedent). Relators' remaining Article XI claims are still pending. *Id.*

{¶ 7} On March 2, 2012, we ordered the parties to file supplemental briefs addressing the following questions and invited them to address any other issues they deemed necessary:

1. Does the Supreme Court of Ohio have jurisdiction over this case when only four of the five members of the apportionment board have been named as respondents and the board has not been named as a party?

2. Does the Ohio Constitution mandate political neutrality in the reapportionment of house and senate districts?

3. What is relators' burden in showing that a reapportionment plan is unconstitutional?

4. Does tension exist among sections 3, 7, and 10 of Article XI of the Ohio Constitution, and if so, how are these sections to be harmonized?

The parties are further permitted to address any other issues they deem necessary to this court's review in the supplemental briefs.

131 Ohio St.3d 1468, 2012-Ohio-848, 962 N.E.2d 800.

**{¶ 8}** After the parties filed their supplemental briefs, we denied relators' motion for leave to file an amended complaint to add Budish as a relator, 131 Ohio St.3d 1519, 2012-Ohio-1783, 965 N.E.2d 1002, and held oral argument.

**{¶ 9}** This cause is now before the court for its consideration of relators' remaining claims.

## Legal Analysis

### *Jurisdiction*

**{¶ 10}** As the parties now agree, neither the apportionment board nor board member Budish is a necessary and indispensable party to this action under Civ.R. 19. We do note, however, that it remains better practice in this type of action to name the board and all its members as parties. The Ohio Constitution, Article XI, Section 13 specifies that this court "shall have exclusive, original jurisdiction in all cases arising under this Article" and further notes that if any apportionment plan "made by the persons responsible for apportionment, by a majority of their number" is determined to be invalid by either this court or the United States Supreme Court, "the persons responsible for apportionment by a majority of their number" shall determine a new, constitutionally compliant plan; *see also Voinovich v. Ferguson*, 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992) (court resolved declaratory-judgment action involving the constitutionality of an apportionment plan in which the apportionment board was not one of the named parties), and *State ex rel. Lehman v. DiSalle*, 173 Ohio St. 361, 182 N.E.2d 564 (1962) (court resolved mandamus action challenging state-senate apportionment plan although board was not named a party).

**{¶ 11}** Thus, the merits of relators' remaining claims are properly before us.

### *Political Neutrality*

**{¶ 12}** Pursuant to the Ohio Constitution, Article XI, Section 1, the five-member apportionment board is responsible for the apportionment of the state for

members of the General Assembly. The board must establish the boundaries for each of the 99 house districts and 33 senate districts every ten years. The method of apportionment of the state for members of the General Assembly is determined by using a ratio of representation, which is calculated by dividing the whole population of the state, as determined by the federal decennial census, by 99 for the house and by 33 for the senate. Ohio Constitution, Article XI, Section 2. The population of each house and senate district must be substantially equal to the applicable ratio of representation, and in no event shall any district contain a population of less than 95 percent or more than 105 percent of the pertinent ratio. Ohio Constitution, Article XI, Sections 3 and 4. Each house district is entitled to a single representative, and each senate district is entitled to a single senator. Ohio Constitution, Article XI, Section 5.

{¶ 13} In assessing relators' Article XI claims, we must initially determine whether these provisions mandate political neutrality in the reapportionment process. " 'Generally speaking, in construing the Constitution, we apply the same rules of construction that we apply in construing statutes.' " *Smith v. Leis*, 106 Ohio St.3d 309, 2005-Ohio-5125, 835 N.E.2d 5, ¶ 57, quoting *State v. Jackson*, 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, ¶ 14. The court's paramount concern in statutory construction is the legislative intent in the statute's enactment, and to discern this intent, we read words and phrases in context according to the rules of grammar and common usage. *State ex rel. Mager v. State Teachers Retirement Sys. of Ohio*, 123 Ohio St.3d 195, 2009-Ohio-4908, 915 N.E.2d 320, ¶ 14. Consequently, our primary concern in construing Article XI is to determine the intent of the electorate in adopting the article, and to discern that intent, we must examine its text.

{¶ 14} The words used in Article XI do not explicitly require political neutrality, or for that matter, politically competitive districts or representational fairness, in the apportionment board's creation of state legislative districts.

Unlike Ohio, some states specify in either constitutional or statutory language that no apportionment plan shall be drawn with the intent of favoring or disfavoring a political party. *See In re Senate Joint Resolution of Legislative Apportionment 1176*, 83 So.3d 597, 615 (Fla.2012), fn. 19, and the state constitutions and statutes cited therein. Therefore, Article XI does not prevent the board from considering partisan factors in its apportionment decision.

{¶ 15} Nevertheless, as relators emphasize in their supplemental brief, and as respondents acknowledge in their supplemental response brief, political considerations cannot override the requirements of Article XI. Other states have reached this same conclusion regarding redistricting in their states. *See Holt v. 2011 Legislative Reapportionment Comm.*, 38 A.3d 711, 745 (Pa.2012) ("It is true, of course, that redistricting has an inevitably legislative, and therefore an inevitably political, element; but, the constitutional commands and restrictions on the process exist precisely as a brake on the most overt of potential excesses and abuse"); *In re Reapportionment of the Colorado Gen. Assembly*, __ P.3d __, 2011 WL 5830123, *3 (Colo.2011) ("Other nonconstitutional considerations, such as the competitiveness of a district, are not per se illegal or improper; however, such factors may be considered only after all constitutional criteria have been met"); *In re Legislative Districting of the State*, 370 Md. 312, 370, 805 A.2d 292 (2002) ("The constitution 'trumps' political considerations. Politics or non-constitutional considerations never 'trump' constitutional requirements").

{¶ 16} Therefore, the Ohio Constitution does not mandate political neutrality in the reapportionment of house and senate districts, but partisan considerations cannot prevail over the requirements set forth in Article XI. As long as the 2011 apportionment plan satisfied the constitutional requirements set forth in Article XI, respondents were not precluded from considering political factors in drafting it. *See Davis v. Bandemer*, 478 U.S. 109, 128, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (plurality opinion), quoting *Gaffney v. Cummings*, 412 U.S.

735, 752-753, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (" 'Politics and political considerations are inseparable from districting and apportionment' "). And, here, political factors were considered only after the applicable constitutional and other legal requirements were met.

*Presumption of Constitutionality and Burden of Proof*

{¶ 17} In assessing the merits of relators' claims, we defer to the apportionment board's reasonable construction of the principles expressed in Article XI. *Voinovich v. Ferguson*, 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992).

> "Hence, it is not sufficient in this proceeding that we might be of the opinion that we could make a better apportionment than has been made by the board: To authorize this court to interfere and command the board to make another apportionment, the apportionment made must so far violate the rules prescribed by the constitution, as to enable us to say, that what has been done is no apportionment at all, and should be wholly disregarded. If by any fair construction of the principles prescribed by the constitution for making an apportionment, the one made may be sustained, then it cannot be disregarded and a new one ordered.
>
> "* * * The very fact that the governor, auditor and secretary of state are consociated as a board to apportion the state for members of the general assemb[l]y, shows of itself, that, in the judgment of the framers of the constitution, in applying the rules prescribed, a discretion would have to be exercised, and those officers were selected to exercise it. Whether the discretion conferred on the board, has been wisely or unwisely exercised in this instance, is immaterial in this proceeding. It is sufficient that they had the power under the constitution to make the

apportionment as they have made it. For the wisdom, or unwisdom, of what they have done, within the limits of the powers conferred, they are answerable to the electors of the state, and no one else."

*Id.* at 204 (Holmes, J., concurring), quoting *State ex rel. Gallagher v. Campbell*, 48 Ohio St. 435, 436-437 and 442, 27 N.E. 884 (1891).

{¶ 18} In resolving claims contesting the constitutionality of a statute, we presume the constitutionality of the legislation, and the party challenging the validity of the statute bears the burden of establishing beyond a reasonable doubt that the statute is unconstitutional. *See State ex rel. Zeigler v. Zumbar*, 129 Ohio St.3d 240, 2011-Ohio-2939, 951 N.E.2d 405, ¶ 24; *Ohio Grocers Assn. v. Levin*, 123 Ohio St.3d 303, 2009-Ohio-4872, 916 N.E.2d 446, ¶ 11.

{¶ 19} Although a board's apportionment plan is not a statute, the same general principle applies in resolving relators' attack on the constitutionality of the apportionment plan as that which is applied to attacks on the constitutionality of statutes for the following reasons:

{¶ 20} First, Article XI was enacted to permit the apportionment board to perform the duty previously conferred on the General Assembly to apportion seats in the General Assembly. In effect, the apportionment board is performing what was previously a legislative function. *See Ely v. Klahr*, 403 U.S. 108, 114, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971) ("districting and apportionment are legislative tasks in the first instance"); *Arizona Minority Coalition for Fair Redistricting v. Arizona Independent Redistricting Comm.*, 220 Ariz. 587, 208 P.3d 676 (2009), ¶ 19 ("Not only do enactments that carry the force of law traditionally originate in the legislature, but the process of redistricting is itself traditionally viewed as a legislative task").

**{¶ 21}** Second, as with legislation, a presumption of validity attaches to the apportionment board's adopted apportionment plan. *See Gallagher*, 48 Ohio St. at 437, 27 N.E. 884 (apportionment board is vested with discretion to adopt decennial apportionment plan, and "[i]f by any fair construction of the principles prescribed by the constitution for making an apportionment, the one made may be sustained, then it cannot be disregarded and a new one ordered"). " '[I]n the absence of evidence to the contrary, public officers, administrative officers and public authorities, within the limits of the jurisdiction conferred upon them by law, will be presumed to have properly performed their duties in a regular and lawful manner and not to have acted illegally or unlawfully.' " *State ex rel. Skaggs v. Brunner*, 120 Ohio St.3d 506, 2008-Ohio-6333, 900 N.E.2d 982, ¶ 51, quoting *State ex rel. Speeth v. Carney*, 163 Ohio St. 159, 186, 126 N.E.2d 449 (1955).

**{¶ 22}** Third, because the people of Ohio placed apportionment authority in the hands of the board, the apportionment plan should be accorded the same, if not greater, consideration as a statute enacted by the General Assembly. It is logical, therefore, to require relators to rebut the plan's presumed constitutionality by proving beyond a reasonable doubt that the apportionment plan is unconstitutional.

**{¶ 23}** Finally, this standard comports with the standard applied by other state supreme courts in resolving constitutional challenges to a reapportionment plan. *See Parella v. Montalbano*, 899 A.2d 1226, 1232-1233 (R.I.2006) (challengers to state legislative redistricting statute had the burden of proving that the statute was unconstitutional beyond a reasonable doubt); *Logan v. O'Neill*, 187 Conn. 721, 729-730, 448 A.2d 1306 (1982) (applying the same burden of proof to a reapportionment plan even though it was not a statute—"Although, here, the legislative action being challenged is not a statute because it is not subject to the approval of the governor, it is entitled to at least the same judicial

10

respect as a statute"); *McClure v. Secy. of the Commonwealth*, 436 Mass. 614, 622, 766 N.E.2d 847 (2002) (plaintiffs challenging constitutionality of legislative redistricting plan could not prevail in the case unless they established beyond a reasonable doubt that it is impossible by any reasonable construction to interpret the redistricting statute in harmony with the state constitution); *In re Wolpoff*, 80 N.Y.2d 70, 78, 587 N.Y.S.2d 560, 600 N.E.2d 191 (1992) ("A strong presumption of constitutionality attaches to the redistricting plan and we will upset the balance struck by the Legislature and declare the plan unconstitutional" only when it is shown to be unconstitutional beyond a reasonable doubt).

**{¶ 24}** Consequently, the burden of proof on one challenging the constitutionality of an apportionment plan is to establish that the plan is unconstitutional beyond a reasonable doubt. In the absence of evidence to the contrary, we presume that the apportionment board properly performed its duties in a lawful manner. With this burden of proof providing the framework for our analysis, we next address relators' claims.

*Ohio Constitution, Article XI, Sections 3, 7, and 10*

**{¶ 25}** Relators assert that the board's apportionment plan violates the Ohio Constitution, Article XI, Sections 7 and 11. To assist this court in resolving this claim, the parties provided supplemental briefs on whether tension exists among Sections 3, 7, and 10 of Article XI, and if so, how these sections could be harmonized.

**{¶ 26}** As noted previously, we apply the same rules of construction that we apply in construing statutes to interpret the meaning of constitutional provisions. *State ex rel. Colvin v. Brunner*, 120 Ohio St.3d 110, 2008-Ohio-5041, 896 N.E.2d 979, ¶ 43. We must first review the words and phrases used. *Id.*

**{¶ 27}** The Ohio Constitution, Article XI, Section 3, provides:

The population of each house of representatives district shall be substantially equal to the ratio of representation in the house of representatives, as provided in section 2 of this Article, and in no event shall any house of representatives district contain a population of less than ninety-five per cent nor more than one hundred five per cent of the ratio of representation in the house of representatives, except in those instances where reasonable effort is made to avoid dividing a county in accordance with section 9 of this Article.

{¶ 28} The Ohio Constitution, Article XI, Section 7, provides:

(A) Every house of representatives district shall be compact and composed of contiguous territory, and the boundary of each district shall be a single nonintersecting continuous line. To the extent consistent with the requirements of section 3 of this Article, the boundary lines of districts shall be so drawn as to delineate an area containing one or more whole counties.

(B) Where the requirements of section 3 of this Article cannot feasibly be attained by forming a district from a whole county or counties, such district shall be formed by combining the areas of governmental units giving preference in the order named to counties, townships, municipalities, and city wards.

(C) Where the requirements of section 3 of this Article cannot feasibly be attained by combining the areas of governmental units as prescribed in division (B) of this section, only one such unit may be divided between two districts, giving

preference in the selection of a unit for division to a township, a city ward, a city, and a village in the order named.

(D) In making a new apportionment, district boundaries established by the preceding apportionment shall be adopted to the extent reasonably consistent with the requirements of section 3 of this Article.

{¶ 29} The Ohio Constitution, Article XI, Section 10, provides:

The standards prescribed in sections 3, 7, 8, and 9 of this Article shall govern the establishment of house of representatives districts, which shall be created and numbered in the following order to the extent that such order is consistent with the foregoing standards:

(A) Each county containing population substantially equal to one ratio of representation in the house of representatives, as provided in section 2 of this Article, but in no event less than ninety-five per cent of the ratio nor more than one hundred five per cent of the ratio shall be designated a representative district.

(B) Each county containing population between ninety and ninety-five per cent of the ratio or between one hundred five and one hundred ten per cent of the ratio may be designated a representative district.

(C) Proceeding in succession from the largest to the smallest, each remaining county containing more than one whole ratio of representation shall be divided into house of representatives districts. Any remaining territory within such county containing a fraction of one whole ratio of representation

shall be included in one representative district by combining it with adjoining territory outside the county.

 (D) The remaining territory of the state shall be combined into representative districts.

**{¶ 30}** In resolving the tension between these constitutional provisions, we note that Article XI of the Ohio Constitution vests the apportionment board with considerable discretion in formulating an appropriate plan. *See* Ohio Constitution, Article XI, Section 3 (requiring the population of each house district to be "*substantially* equal to the ratio of representation" [emphasis added]); Article XI, Section 7(A) (requiring house district boundary lines to be drawn so as to delineate an area that contains one or more whole counties "[t]o the *extent consistent* with the requirements of section 3" [emphasis added]); Article XI, Section 7(B) (requiring that house districts be formed by combining the areas of governmental units in the order specified where Section 3 population requirements "cannot *feasibly* be attained" by forming a district from a whole county or counties [emphasis added]); Article XI, Section 7(C) (requiring the division of only one governmental unit in the order specified when the Section 3 population requirements "cannot *feasibly* be attained" by combining the areas of governmental units in accordance with Section 7(B) [emphasis added]); Article XI, Section 7(D) (requiring the adoption of district boundaries established by the preceding apportionment "to the *extent reasonably consistent*" with the Section 3 population requirements [emphasis added]).

**{¶ 31}** This court does not sit as a super apportionment board to determine whether a plan presented by the relators is better than the plan adopted by the board. Instead, we determine whether the board acted within the broad discretion conferred upon it by the provisions of Article XI when it adopted its plan. As respondents observe, whether relators have presented a "better" apportionment

plan is irrelevant in determining whether relators have met their burden to establish that the board's September 30, 2011 apportionment plan is unconstitutional. The role of a supreme court in considering constitutional challenges to an apportionment plan is restricted to determining whether relators have met their burden to prove that the plan adopted by the board is unconstitutional beyond a reasonable doubt. *See State ex rel. Cooper v. Tennant*, 229 W.Va. 585, 730 S.E.2d 368, 2012 WL 517520 (2012), paragraph twelve of the syllabus ("The only role of the Supreme Court of Appeals of West Virginia in determining whether a state legislative redistricting plan is constitutional is to assess the validity of the particular plan adopted by the Legislature under both federal and state constitutional principles, rather than to ascertain whether a better plan could have been designed and adopted"); *Wilson v. State ex rel. State Election Bd.*, 270 P.3d 155, ¶ 1 (Okla.2012) (litigant's mere statement that his redistricting plan is better than the plan passed by the state legislature and signed by the governor was insufficient to support claim that the plan was invalid); *Arizona Minority Coalition*, 220 Ariz. 587, 208 P.3d 676, at ¶ 46 ("the fact that a 'better' [redistricting] plan exists does not establish that this plan lacks a reasonable basis").

**{¶ 32}** In fulfilling our limited role, we read together the constitutional provisions that are in pari materia, and we attempt to give full application to every part of each of them unless they are irreconcilable and in hopeless conflict. *See Smith v. Leis*, 106 Ohio St.3d 309, 2005-Ohio-5125, 835 N.E.2d 5, ¶ 57. If there is an irreconcilable conflict, the special provision prevails over the general provision, unless the general provision was adopted later and the manifest intent is that the general provision prevail. *Summerville v. Forest Park*, 128 Ohio St.3d 221, 2010-Ohio-6280, 943 N.E.2d 522, ¶ 26-27.

**{¶ 33}** But if the sections are coequal—that is, if neither is more specific and both were adopted at the same time—then the apportionment board is

empowered to apply either one of them. *Voinovich*, 63 Ohio St.3d at 200, 586 N.E.2d 1020. Consequently, when coequal provisions of Article XI of the Ohio Constitution are irreconcilable, the apportionment board has the duty to choose the proper course, and this court will not order it to correct one constitutional violation by committing another. *Id.*

{¶ 34} One of the main considerations of the joint secretaries in formulating their proposed plan was preserving the boundaries of existing legislative districts, which is consistent with the requirement of Section 7(D). Moreover, apportionment boards have historically treated the division of noncontiguous local governmental units as not constituting a violation of Sections 7(A), (B), or (C). In 1981, the apportionment board did not count 16 divisions of noncontiguous governmental units as divisions for purposes of Article XI; in 1991, the apportionment board did not count 25 such divisions; and in 2001, the apportionment board did not count 34 of these divisions. The board considered the division of noncontiguous governmental units as having been accomplished by local officials through annexation rather than by the board through apportionment. This practice of not counting divisions of noncontiguous governmental units has been followed by apportionment boards that have had both Democratic and Republican majorities. Additionally, comparison between the 2011 and 2001 apportionment plans indicates that the number of divisions of counties in both plans is comparable (74 for the 2011 apportionment plan and 73 for the 2001 apportionment plan).

{¶ 35} In fact, by retaining district boundaries similar to those in the previous apportionment plan—and thereby enhancing representational continuity for district residents—the board's plan is more compliant with Section 7(D) than the alternative plan that was timely submitted to the apportionment board by the Joint Democratic Caucuses or, for that matter, the alternative plans submitted by relators' expert, Professor Michael McDonald.

**{¶ 36}** Relators argue that the board erred in relying on Section 7(D) to justify violations of Sections 7(A), (B), and (C) because Section 7(D) is subordinate to the other subsections. They claim that because Section 7(D) is the last subsection, it is also last in priority.

**{¶ 37}** A review of the plain text of Section 7, however, dispels that contention. Sections 7(A), (B), and (C) are interconnected so that if the Section 3 population requirements cannot feasibly be attained by drawing the line according to Section 7(A), then Section 7(B) is followed, and if they cannot feasibly be attained by following Section 7(B), then Section 7(C) is followed. Section 7(D), however, is not phrased in a manner that subordinates it to Sections 7(A), (B), and (C). Instead, Section 7(D) is phrased to apply broadly to the board's "new apportionment" and, like Sections 7(A), (B), and (C), is governed by the population requirements of Section 3. There is no language suggesting that Section 7(D) may be followed only if Sections (A), (B), and (C) are inapplicable.

**{¶ 38}** Therefore, the Ohio Constitution, Article XI, Section 7(D) is coequal with Article XI, Sections 7(A), (B), and (C), and in accordance with *Voinovich*, 63 Ohio St.3d at 200, 586 N.E.2d 1020, the court will not order the apportionment board to correct a violation of Sections 7(A), (B), and (C) by violating Section 7(D).

**{¶ 39}** Relators next assert that even if Section 7(D) is coequal with Sections 7(A), (B), and (C), that fact does not justify respondents' alteration of previous district boundaries from the 2001 apportionment plan. That is, relators contend that pursuant to Section 7(D), "if a prior district's population is 'reasonably consistent with the requirements of Section 3,' then the 'district boundaries established by the preceding apportionment shall be adopted.' "

**{¶ 40}** But once again, relators ignore the plain text of Section 7(D), which provides, "In making a new apportionment, district boundaries established by the preceding apportionment shall be adopted *to the extent reasonably*

*consistent* with the requirements of section 3 of this Article." (Emphasis added.) In essence, relators' interpretation replaces the phrase, "to the extent"—a phrase that vests the apportionment board with discretion—with the conditional term "if." But this interpretation changes the meaning of Section 7(D), which we cannot do. *See State ex rel. Russo v. McDonnell*, 110 Ohio St.3d 144, 2006-Ohio-3459, 852 N.E.2d 145, ¶ 50 (in construing statutes, court cannot add or delete language); *State ex rel. LetOhioVote.org v. Brunner*, 123 Ohio St.3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 49 (courts are not authorized to add exceptions that are not contained within the express language of constitutional provisions).

{¶ 41} Therefore, the Ohio Constitution vests discretion in the apportionment board to adopt the prior district's boundaries "to the extent reasonably consistent" with the Section 3 population requirements, and this discretionary language confers the authority on the apportionment board to adopt district boundaries that are not identical to those used in the prior apportionment.

{¶ 42} Relators' claims focus on the board's divisions of governmental units. Because those divisions were warranted by both the bipartisan historical practice of prior apportionment boards and the Section 7(D) requirement of keeping boundaries similar to those used in the prior apportionment, we will not order respondents to correct the alleged violations of Sections 7(A), (B), and (C) by committing a violation of Section 7(D). Similarly, given the discretion accorded respondents under Section 7(D) and the related provisions, relators have not established by proof beyond a reasonable doubt that respondents' purported failure to use the exact same boundary lines as the 2001 apportionment plan for a few districts constituted a violation of that section.

*Relators' Evidence*

{¶ 43} Relators primarily rely on the two alternative apportionment plans of their expert, Professor McDonald, to meet their heavy burden of proof in this

special proceeding. For the following reasons, however, these alternative plans are insufficient to carry that burden.

{¶ 44} First, they appear to be based on the same flawed interpretation of Section 7(D) advocated by relators.

{¶ 45} Second, as previously discussed, whether a litigant has presented a "better" apportionment plan is irrelevant to the court's determination of whether the plan adopted by the apportionment board is constitutional. *See Cooper*, 730 S.E.2d 368, 2012 WL 517520, at paragraph twelve of the syllabus; *Arizona Minority Coalition*, 220 Ariz. 587, 208 P.3d 676, at ¶ 46.

{¶ 46} Third, Professor McDonald's affidavits are replete with conclusory statements that lack specific factual support. For example, he states that the apportionment board's plan "split over 250 political subdivisions," while each of his alternative plans "divides less than 100 subdivisions," but he offers no detailed explanation of what he counted as a split or division, and he does not enumerate each of the subdivisions split by the various plans. In the absence of more detailed factual support, we are left to wonder about the analytical choices made by relators' expert and the concomitant viability of his conclusions. And insofar as relators argue that Professor McDonald's plans contain many fewer divisions of governmental units than are contained in the board's plan and do not violate any other constitutional provisions, his affidavits simply contain insufficient evidence to establish the truth of their assertion. Indeed, from his affidavits, it is unclear whether Professor McDonald even considered all the applicable criteria, unlike respondents, who established that they had considered all the applicable criteria in formulating and adopting their plan. Notably, in an unrelated case, a federal district court recently held that Professor McDonald's expert opinion was unreliable because, among other reasons, he failed to consider all the applicable principles that guide redistricting. *Backus v. South Carolina*, 857 F.Supp.2d 553, 562 (D.S.C.2012). His conclusory opinion here appears to be similarly defective.

**{¶ 47}** Finally, relator claims that courts have regularly relied on a litigant's alternative plans in assessing the validity of an apportionment plan, citing *Holt*, 38 A.3d 711, *Twin Falls Cty. v. Idaho Comm. on Redistricting*, 152 Idaho 346, 271 P.3d 1202 (2012), and *In re Reapportionment of the Colorado Gen. Assembly*, __ P.3d __, 2011 WL 5830123. But in each of these cases, the alternative plans reviewed by the courts were timely submitted to the state's apportionment body for its review in the process of adopting a plan. *Holt* at 753-754 and fn. 32; *Twin Falls* at 1206-1207; *Reapportionment of the Colorado Gen. Assembly* at *3-4. By contrast, both of Professor McDonald's alternate apportionment plans were not timely submitted to the apportionment board, but were instead submitted as evidence in a case filed more than three months after the board approved its 2011 plan.

### Conclusion

**{¶ 48}** The role of this court in adjudicating challenges to apportionment is limited: we consider the plan against the requirements of the United States and Ohio Constitutions, as interpreted by federal and state decisional law. In making our determination, we accord the apportionment board the deference it is afforded by the constitution in attempting to take into account various federal and state requirements by placing the burden on one challenging an apportionment plan to establish its unconstitutionality beyond a reasonable doubt. Relators have failed to adduce sufficient, credible proof to carry this heavy burden. Therefore, relators are not entitled to a declaration that the 2011 apportionment plan is unconstitutional or a prohibitory injunction to prevent elections from being conducted in accordance with that plan, and we accordingly deny the requested relief.

Relief denied.

WILLAMOWSKI, LANZINGER, and CUPP, JJ., concur.

O'CONNOR, C.J., and PFEIFER and MCGEE BROWN, JJ., dissent.

JOHN R. WILLAMOWSKI, J., of the Third Appellate District, sitting for LUNDBERG STRATTON, J.

_____

**PFEIFER, J., dissenting.**

{¶ 49} There will always be tension between political power and the constraints of the Ohio Constitution when a new map for the boundaries of legislative districts is drawn. Ohio voters Charles Wilson and others have put the question of constitutionality in play by bringing this action. Article XI, Section 13 of the Ohio Constitution places on this court the duty to answer that question without deference to either party. There is no basis in the Ohio Constitution, in fairness, in justice, or in political reality for this court to cloak the apportionment board's actions with a presumption of constitutionality that can be overcome only by proof beyond a reasonable doubt. In doing so, the majority opinion is just plain wrong. It relegates this court to the status of a pawn in a high-stakes political chess match.

{¶ 50} The drafters of Article XI fully understood that they were placing the difficult duty of map drawing in the hands of the state's top partisan office holders, knowing that they would draw the districts to their partisan advantage, limited only by federal law and the Ohio Constitution. Likewise, they understood that when the board's work was done, questions of constitutional compliance could arise and, if they did, they should be answered directly by this court. A process for the board to correct any constitutional violations found by this court or the United States Supreme Court is also detailed in Article XI, Section 13.

{¶ 51} As we review the adopted maps, the evidence of the process that resulted in the maps, and alternative map choices, it must be with an effort to be strictly neutral in assessing the finished product of the adopted apportionment plan while keeping in mind a fair and normal reading of the constraints found in Article XI of our Constitution.

{¶ 52} Article XI of the Ohio Constitution is well organized and comprehensive in setting out the rules and process for apportionment. The makeup of the apportionment board is set out in Section 1. Determination of the population parameters for each legislative district is to be achieved by following a precise succession of chronological steps found in Sections 2, 3, 4, and 5. Section 6 establishes that the apportionment plan is to be revised after the completion of each federal decennial census.

{¶ 53} Section 7 controls the process to be followed by the apportionment board in mapping the boundary lines of House of Representative districts. The steps are defined in four paragraphs that make sense when read in normal progression, top to bottom. Sections 8 and 9 address issues not being contested in this litigation. Section 10 provides instruction for numbering House of Representative districts when the mapping process is completed.

{¶ 54} The question before us is this: Does the apportionment plan adopted by the board comply with the mandates of the Ohio Constitution? Our determination should not be influenced by evidence that persons who were tasked with drawing the boundaries sent self-promoting e-mails proclaiming success in drawing legislative boundaries that favor the political party controlling the board. That such an effort was undertaken should be presumed and is no more shocking than gambling in Rick's Cafe. Nor is it our function to choose an alternative apportionment plan. Alternative plans are useful, however, in assessing whether the adopted plan was designed to achieve compactness and minimization of splits of governmental units, as required by Article XI, Section 7 of the Ohio Constitution.

{¶ 55} Having reviewed the adopted plan and compared it with the submitted evidence, I reluctantly conclude that the constitutional challenge has merit. The board should be directed to reconvene pursuant to Section 13 for the purpose of adopting a revised plan that more nearly optimizes the mandates of

Section 7 with respect to compactness and minimization of splits of governmental units. In her dissent, Justice McGee Brown has well documented many of the splits that should have been avoided. In total, 39 counties (out of 88) have been split 74 times. The lack of compactness of the current map is self-evident.

{¶ 56} The majority, having reviewed the same evidence, concludes that the plan is constitutional. I agree with the majority opinion's implicit rejection of the board's principal argument supporting constitutionality: that Section 10, which relates to numbering of districts, somehow can be used to guide mapping. In order to justify its finding of constitutionality, the majority opinion expresses two conclusions of questionable legitimacy; these anchors of the majority opinion fail the tests of logic and fairness. First the majority opinion erects a nearly insurmountable barrier to a successful constitutional challenge by assigning to the board's actions a blanket presumption of constitutionality and requiring proof beyond a reasonable doubt to establish that the plan fails to meet all constitutional requirements. Majority opinion, paragraph two of the syllabus.

{¶ 57} The two cites given by the majority opinion as authority for that standard stand for the proposition that public officials are presumed to have acted lawfully, not that the constitutionality of their work product can be overcome only by proof beyond a reasonable doubt. *See State ex rel. Skaggs v. Brunner*, 120 Ohio St.3d 506, 2008-Ohio-6333, 900 N.E.2d 982, ¶ 51, and *State ex rel. Speeth v. Carney*, 163 Ohio St. 159, 186, 126 N.E.2d 449 (1955). Proof beyond a reasonable doubt is typically necessary only in criminal cases. Such a high burden of proof in the current constitutional matter turns this court into a rubber stamp, not the guardian of the constitution that it is designed to be.

{¶ 58} Next, the majority adopts the board's secondary argument, concluding that Section 7(D) can subsume and override the express directives of Sections 7(A), 7(B), and 7(C) regarding the compactness of districts and the requirement to minimize splits. Section 7(D), properly interpreted, directs the

board to follow the district lines of the prior apportionment where possible. But unless Section 7(D) is subservient to the paragraphs above it, a board could justify the adoption of an incumbent-protecting apportionment plan and forgo any effort to achieve compactness and minimize splits of governmental units. The majority's interpretation is illogical. Its reading of Section 7 undermines the long-accepted constitutional foundation of Ohio's apportionment process: legislative districts should be compact and respectful of the boundaries of governmental units.

{¶ 59} The majority opinion's conclusion could lead to an absurd result. Based on the majority opinion, provisions of a prior plan that are patently unconstitutional would be protected, possibly forever, by the dominion granted to Section 7(D) over the critically important Sections 7(A), 7(B), and 7(C).

{¶ 60} Remapping by the apportionment board would certainly bring no pleasure to the members of the General Assembly in either political party. All incoming House members and half of the incoming Senate members recently won elections in the newly drawn districts. Because of this plan's serial violations of the Section 7 constitutional mandate for compactness of legislative districts and minimization of governmental-unit splits, however, remapping is required.

{¶ 61} I dissent.

O'CONNOR, C.J., concurs in the foregoing opinion.

_____

**MCGEE BROWN, J., dissenting.**

{¶ 62} "The achieving of fair and effective representation for all citizens is * * * the basic aim of legislative apportionment." *Reynolds v. Sims*, 377 U.S. 533, 565-566, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). In 1967, the people of this state amended Article XI of the Ohio Constitution to provide exacting detail on how legislative districts are to be drawn. Article XI outlines at length the priority to be given to keeping counties and local-government units whole and keeping

existing district lines.  However, today the majority upholds a redistricting scheme that Article XI was specifically designed to prevent.  By elevating Section 10 (prescribing procedure for creating house districts) over the clear mandates of Sections 3 (population mandates) and 7 (retaining whole counties and governmental units), the majority permits respondents to elevate political considerations over Article XI.

**{¶ 63}** In a Maryland case involving a redistricting plan, the highest court in that state noted that "[b]ecause it involves redrawing the lines of legislative districts, the process of reapportionment is an intensely political process.  But it is also a legal one, for there are constitutional standards that govern both the process and the redistricting plan that results from it."  *In re Legislative Redistricting of the State*, 370 Md. 312, 320, 805 A.2d 292 (2002).  The statement applies equally to Ohio's reapportionment process.  Although political considerations may affect the determination, they cannot control it in contravention of the specific standards set forth by the people of the state in Article XI.

*The Recurring Apportionment Problem*

**{¶ 64}** Relators claim that the apportionment plan adopted by respondents violates Article XI, Sections 7 and 11.  These sections were adopted in 1967, and since their adoption, this court and federal courts have regularly addressed challenges concerning the apportionment plans adopted by the Ohio Apportionment Board following the decennial federal census.  *See, e.g., Parker v. State*, 263 F.Supp.2d 1100 (S.D.Ohio 2003) (2001 apportionment plan); *Voinovich v. Ferguson*, 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992) (1991 apportionment plan); *Quilter v. Voinovich*, 981 F.Supp. 1032 (N.D.Ohio 1997) (1991 apportionment plan); *Armour v. State*, 775 F.Supp. 1044 (N.D.Ohio 1991) (1981 apportionment plan).

**{¶ 65}** Former United States Senator William L. Marcy once said that "to the victors belong the spoils of the enemy."  http://www.bartleby.com/

100/690.63.html. At the September 26, 2011 apportionment-board hearing, Auditor Dave Yost submitted for the record a portion of *A Columnist's View of Capitol Square*, written by Lee Leonard, which observes that in 1971, when Democrats controlled the apportionment board, they created legislative districts that resulted in their party's gaining control of both houses of the General Assembly, and that in 1991, when Republicans controlled the board, they created legislative districts that eventually resulted in their controlling both houses of the General Assembly.

{¶ 66} Consequently, neither party stands before this court with clean hands or intellectual purity. Each party has used the apportionment process for political gain with almost utter disregard for the dictates of Article XI.

*General Principles*

{¶ 67} Before turning to those matters upon which I disagree with the majority, I first note those matters with which I agree. I agree that we have jurisdiction over the merits of this case even though neither the apportionment board nor all of the board members are named as respondents. Ohio Constitution, Article XI, Section 13. I also agree with the general propositions specified in the syllabus concerning political neutrality; the initial burden of proof; the principle that when coequal Article XI provisions are irreconcilable, we will not order the apportionment board and its members to correct one constitutional violation by committing another; and the holding that Article XI, Section 7(D) is coequal with Article XI, Sections 7(A), (B), and (C).

{¶ 68} However, I respectfully dissent from the majority's implicit determination that the subordinate procedure set forth in Section 10 takes priority over Sections 7(A) through (D). In other words, I disagree that Section 10's procedure for creating house districts takes priority over Section 7's requirements for keeping whole counties and governmental units together.

{¶ 69} The 1967 amendment set forth a specific process for apportionment that would protect the integrity of governmental units by minimizing their division. By allowing respondents to elevate Section 10 over Section 7, the majority ensures that the apportionment process will become more political with each decennial plan.

*Political Neutrality*

{¶ 70} Although the text of Article XI does not specifically prohibit the use of political considerations in apportioning state legislative districts, the historical context of the constitutional apportionment provisions indicates that they were adopted to limit the importance of politics. As this court previously explained:

> Prior to the Constitution of 1851, the apportionments of legislative districts had been made by the General Assembly with the result that oftentimes political advantage was sought to be gained by the party in power. Accordingly Article XI was incorporated in the Constitution for the purpose of correcting the evils of former days by placing the power of apportionment in the hands of a board composed of the Governor, the Auditor of State and the Secretary of State and making the provisions self-acting.
>
>     * * *
>
>     The objective sought by the constitutional provisions was the prevention of gerrymandering. By creating a board of *ex officio* members and adopting self-acting provisions it was sought to place the function of apportionment in impartial hands and at the same time mark the way so that in the main at least the provisions of the Constitution would work automatically and the apportioning process ordinarily would be a mere matter of calculation.

*State ex rel. Herbert v. Bricker*, 139 Ohio St. 499, 508-509, 41 N.E.2d 377 (1942). *See also* Steinglass & Scarselli, *The Ohio State Constitution: A Reference Guide* 279 (2004) (Article XI "was included in the 1851 Constitution to prevent gerrymandering, a common practice in the first fifty years of statehood").

> The purpose of the people in enacting Article XI is clear. It was to place legislative apportionment in the hands of a separate board not subject to the control of the General Assembly, the board to be composed of representatives of the people, elected by the people and unconnected with the legislative branch of government.

*State ex rel. King v. Rhodes*, 11 Ohio St.2d 95, 99, 228 N.E.2d 653 (1967).

{¶ 71} Respondents claim that the foregoing precedent is no longer applicable because in 1967, Ohio amended Article XI to comply with the one-person-one-vote principle of cases like *Reynolds v. Sims*, 377 U.S. at 568, 84 S.Ct. 1362, 12 L.Ed.2d 506, and *Nolan v. Rhodes*, 378 U.S. 556, 84 S.Ct. 1906, 12 L.Ed.2d 1034 (1964).

{¶ 72} It is true that the 1967 amendment to Article XI eliminated many of the automatic and self-acting provisions that characterized the version contained in the 1851 Constitution and its 1903 amendment so that General Assembly districts could be apportioned on a substantially equal-population basis. But by no means did the new provisions harken a return to the old days of political gerrymandering that the Article was originally adopted to eliminate.

{¶ 73} Instead, the 1967 amendment set forth mandatory, nonpartisan criteria to be used by the apportionment board in reapportioning state legislative districts. *See, e.g.*, Article XI, Sections 3 (population of house districts), 4

(population of senate districts), 5 (single member for each district), and 7 (boundary lines for house districts).

{¶ 74} Furthermore, contrary to respondents' assertion, the 1967 amendment's inclusion of "partisanly-elected political official[s]" on the apportionment board did not contemplate a "political process by design" any more than did the 1851 version's inclusion of the governor, auditor, and secretary of state on the apportionment board.

{¶ 75} The 1967 amendment simply did not change the objective of Article XI—to prevent the political gerrymandering engendered by leaving the apportionment process entirely to the political party controlling the General Assembly. And to determine the soundness of the challenged apportionment plan, we "look not only to the letter of the constitutional provisions but to their spirit and purpose." *Herbert*, 139 Ohio St. at 508, 41 N.E.2d 377.

{¶ 76} In sum, then, while Article XI does not require political neutrality in the apportionment process, partisan considerations cannot prevail over the nonpartisan requirements set forth in Article XI.

*Burden of Proof*

{¶ 77} I agree with the majority that the initial burden of proof is on the party challenging the constitutionality of an apportionment plan to establish that the plan is unconstitutional beyond a reasonable doubt. And I agree that in the absence of evidence to the contrary, we presume that the apportionment board and its members performed their duties in a lawful manner.

{¶ 78} However, as the United States Supreme Court recently observed in a case upholding the individual mandate of the Patient Protection and Affordable Care Act, "[o]ur deference in matters of policy cannot * * * become abdication in matters of law." *Natl. Fedn. of Independent Business v. Sebelius*, __ U.S. __, 132 S.Ct. 2566, 2579, 183 L.Ed.2d 450 (2012). I would hold that any presumed validity of the apportionment plan is rebutted when relators establish that the plan

violates the provisions of Article XI of the Ohio Constitution. Under these circumstances, we must review the applicable constitutional provisions without deference to the apportionment board.

**{¶ 79}** Respondents claim that after proving that the plan is unconstitutional beyond a reasonable doubt, relators must establish beyond a reasonable doubt that the apportionment board also acted without a rational basis. This contention lacks merit. As relators note, if a plan is unconstitutional, it cannot be resuscitated by reliance on a nonconstitutional criterion, e.g., retention of an incumbent or political composition. Acting on such a factor would not be rational. *See In re Reapportionment of the Colorado Gen. Assembly*, __ P.3d __, 2011 WL 5830123 (Colo.2011), at *3 ("Other nonconstitutional considerations, such as the competitiveness of a district, are not per se illegal or improper; however, such factors may be considered only after all constitutional criteria have been met").

**{¶ 80}** Moreover, one of the cases respondents cite for this proposition is *In re Reapportionment of Towns of Hartland, Windsor, & W. Windsor*, 160 Vt. 9, 624 A.2d 323 (1993), but the Vermont Supreme Court noted in that case that "once petitioners have shown that the State has failed to meet constitutional or statutory standards or policies with regard to a specific part of the plan, the State then has the burden to show that satisfying those requirements was impossible because of the impermissible effect it would have had on other districts." *Id.* at 16. Other states have also shifted the burden of proof to the parties responsible for the apportionment plan to justify their departure from certain constitutional provisions once relators established that the plan is unconstitutional in some respect. *See In re Legislative Districting of the State*, 370 Md. at 368, 805 A.2d 292 (when apportionment plan raised sufficient issues with respect to its compliance with state constitutional requirements, court placed burden of proof on the state to justify the plan); *In re Reapportionment of Colorado Gen.*

*Assembly*, 45 P.3d 1237, 1241 (Colo.2002) (court held that if an apportionment plan does not comply with the county-boundary requirement of the Colorado Constitution, the reapportionment commission must make an adequate factual showing that less drastic alternatives could not have satisfied the equal-population constitutional requirement); *In re Legislative Districting of Gen. Assembly of Iowa*, 193 N.W.2d 784, 791 (Iowa 1972) (state failed to sustain burden of proof to show why state legislative reapportionment plan could not comply with state constitution's compactness requirement).

**{¶ 81}** This approach is logical. The respondents who crafted and approved the apportionment plan are in the best position to know the basis for any noncompliance with Article XI.

**{¶ 82}** Therefore, I would hold that once relators make a prima facie showing beyond a reasonable doubt that respondents have violated a provision of Article XI of the Ohio Constitution, the burden of proof shifts to respondents to justify that violation based on the avoidance of a violation of another superior or coequal legal requirement.

*Article XI, Sections 3, 7, and 10*

**{¶ 83}** In our briefing order, we asked whether tension existed among Sections 3, 7, and 10 of Article XI of the Ohio Constitution, and if so, how these sections should be harmonized. 131 Ohio St.3d 1468, 2012-Ohio-848, 962 N.E.2d 800.

**{¶ 84}** The plain language of the subsections in Section 7 establishes that Section 7 is subordinate to the population requirements of Section 3: Section 7(A) directs the apportionment board to draw the boundary lines of house districts to delineate an area "containing one or more whole counties" "[t]o the extent consistent with the requirements of section 3"; Section 7(B) directs the apportionment board to create districts by combining the areas of governmental units in the order specified "[w]here the requirements of section 3 of this Article

31

cannot feasibly be attained by forming a district from a whole county or counties [as prescribed in division (A)]"; Section 7(C) directs the apportionment board to divide only one governmental unit between two house districts in the order specified "[w]here the requirements of section 3 of this Article cannot feasibly be attained by combining the areas of governmental units as prescribed in division (B) of this section"; and finally, Section 7(D) directs the apportionment board to adopt the house-district boundaries established by the preceding apportionment "to the extent reasonably consistent with the requirements of section 3 of this Article." Consequently, there is no conflict—inherent or otherwise—between the requirements of Sections 3 and 7 because, by its very terms, Section 7 is subordinate to the population requirements of Section 3.

{¶ 85} Similarly, there is no conflict between Section 10 and Sections 3 and 7. The introductory language in Section 10 makes clear that the *substantive* standards set forth in Sections 3, 7, 8, and 9 govern the creation of house districts and that the *procedure* specified in Section 10 applies only insofar as it is consistent with those standards: "The standards prescribed in sections 3, 7, 8, and 9 of this Article shall govern the establishment of house of representatives districts, which shall be created and numbered in the following order *to the extent that such order is consistent with the foregoing standards*." (Emphasis added.) Ohio Constitution, Article XI, Section 10.

{¶ 86} Therefore, under the plain language of these sections, if there is a conflict, Section 3 prevails over Sections 7 and 10 and Section 7 prevails over Section 10.

{¶ 87} I agree with the majority that Sections 7(A) through (C) are coequal with Section 7(D). Sections 7(A) through (C) require that every house district be compact and contiguous and, to the extent it can do so and still meet the requirements of Section 3, that it contain one or more whole counties; and if the district cannot be made out of a whole county or counties and still meet the

requirements of Section 3, then it must be formed by combining the areas of local governmental units in the order specified in Section 7(B), and if the requirements of Section 3 cannot feasibly be attained by combining the areas of local governmental units, then they must be divided, giving preference for division as specified in Section 7(C), and only one local governmental unit may be divided between two districts. Section 7(D) requires that district boundaries established by the preceding apportionment be used to the extent reasonably consistent with the requirements of Section 3. Because Sections 7(A) through (C) are coequal with Section 7(D), when the sections cannot simultaneously be satisfied, the apportionment board may determine which of the provisions to follow. *See Voinovich*, 63 Ohio St.3d at 200, 586 N.E.2d 1020.

*Respondents' Contentions*

{¶ 88} Respondents contend that their apportionment plan should not be analyzed on the district-by-district basis set forth in relators' complaint and briefs. According to respondents, with whom the majority implicitly agrees, "the boundaries of districts created at the end of the [apportionment] process are greatly affected by decisions made in districts created earlier," so that any constitutional violations in the latter districts are within the board's discretionary authority to make. This claim—which equates to "because we have already violated the constitution, we can continue to violate the constitution"—lacks merit. The procedure in Section 10 is subordinate to the substantive constitutional requirements in Sections 3 and 7(A), (B), (C), and (D) of Article XI.

{¶ 89} Nor is there any merit in respondents' claim that the court should not consider Professor Michael McDonald's alternative plans because they were not presented to the board. The court is not determining whether respondents should have adopted one of the alternative plans. Instead, we are determining whether respondents complied with the applicable requirements of Article XI.

Nothing in the Ohio Constitution or other applicable law prevents this court from considering all relevant evidence in that regard.

{¶ 90} Respondents also raise a host of justifications for their violations of various provisions of Article XI, including that they had no duty to minimize divisions of governmental units in adopting their apportionment plan. Their argument completely ignores the plain language of Sections 7(A), (B), and (C), which require minimal divisions to the extent possible without violating the population requirements of Section 3.

{¶ 91} Respondents further contend that they were justified in violating Article XI where they attempted to comply with Sections 3, 7(D), and 10. However, there is nothing in Section 3 that permits respondents to violate Sections 7(A), (B), and (C) to make the populations of districts more "substantially equal." Instead, if the board can make districts that comply with both Section 3 and Sections 7(A) through (C), they have a duty to do so. That is, respondents can violate Sections 7(A), (B), and (C) based on Section 3 only when complying with both sections is not feasibly attainable. Respondents' focus on Sections 7(D) and 10 completely ignores the requirements of Sections 7(A) through (C).

{¶ 92} Section 7(D) does not—as respondents claim—give them license to change district borders any way they see fit in purported compliance with a requirement to keep a district's boundaries substantially similar to the district's previous boundary lines. Instead, as relators note, as long as the Section 3 requirements are met, Section 7(D) specifies that the district boundaries "shall be adopted." And if the Section 3 requirements are not met by the prior district, Section 7(D) does not require that the board adopt substantially similar boundary lines.

{¶ 93} The majority's interpretation of Section 7(D) authorizes innumerable violations of Sections 7(A), (B), and (C) by allowing unnecessary

divisions of governmental units based on a nonexistent requirement that the boundaries of new districts be substantially similar to those in the preceding apportionment districts. By applying a malleable standard of substantial adherence to previous district lines, an apportionment board could condone a myriad of violations of Article XI to achieve partisan gain. The citizens of Ohio could not have intended this absurd result when they adopted Section 7(D). *State ex rel. LetOhioVote.org v. Brunner*, 123 Ohio St.3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 50 (court has duty to construe constitutional provision to avoid unreasonable or absurd result).

*Article XI, Section 7(A)*

{¶ 94} Article XI, Section 7(A) specifies that "[t]o the extent consistent with the requirements of section 3 of this Article [requiring that the population of each house district be substantially equal to the house's ratio of representation and in no event less than 95 percent nor more than 105 percent of the ratio], the boundary lines of districts shall be so drawn as to delineate an area containing one or more whole counties."

{¶ 95} Notwithstanding the clear language of this provision, relators have established that for several house districts in the apportionment plan adopted by the board, respondents divided counties when it appears it was unnecessary to do so to meet the population requirements of Article XI, Section 3.[1] In violation of Section 7(A), House Districts 70, 78, 84, 91, 94, and 95 were created by dividing certain counties when such divisions were not necessary to satisfy Section 3 population requirements. As the apportionment board's joint secretaries' own analysis of the board's plan establishes, the division of Holmes County for House District 70, Athens, Pickaway, and Muskingum Counties for House District 78,

---

1. Because relators have met their burden of proof for these violations, the burden should shift to respondents to show that the violations were necessary to comply with other superior or coequal sections.

Auglaize and Shelby Counties for House District 84, Ross County for House District 91, Athens, Vinton, and Washington Counties for House District 94, and Washington County for House District 95 are not required by the applicable provisions of Article XI. And the alternative apportionment plans submitted by relators' expert, Professor McDonald, prove that an apportionment plan need not violate Section 7(A) by splitting these counties.[2]

{¶ 96} Respondents attempt to justify their division of these counties and concomitant violation of Section 7(A) by relying on Sections 10(C) and (D). But Sections 10(C) and (D) should not be applied if they conflict with Section 7(A). The introductory language in Section 10 makes clear that the substantive standards set forth in Sections 3, 7, 8, and 9 govern the creation of house districts and that the procedure provided in Section 10 applies only insofar as it is consistent with those standards. *See also The Ohio State Constitution: A Reference Guide* 286 ("section 10 prescribes the method for creating house districts *subject to* the population requirement of section 3 and *the preference for creating districts out of whole counties in sections 7-9*" [emphasis added]). Because Sections 10(C) and (D)—in the manner that respondents applied them here—are inconsistent with the application of Section 7(A) regarding House Districts 70, 78, 84, 91, 94, and 95, respondents cannot rely on Sections 10(C) and (D) to justify their violation of Section 7(A) in dividing the specified counties. Unlike the provisions at issue in *Voinovich*, 63 Ohio St.3d at 200, 586 N.E.2d 1020, Section 10 is not coequal with Section 7, and thus, respondents were not permitted to remedy the conflict by ignoring Section 7.

{¶ 97} For example, with regard to House District 70, respondents attempt to justify their plan's violation of Section 7(A) based on Section 7(D), citing

2. I am not suggesting that respondents must adopt Professor McDonald's plan, but am merely pointing out that relators have met their burden in demonstrating that violating Section 7(A) was unnecessary.

paragraph 88 of Heather Mann's affidavit in support of this argument. But this paragraph from Mann's affidavit cites only Sections 10(C) and 10(D) and does not support respondents' claim that Section 7(D) required their split of Holmes County in creating the house district.[3]

{¶ 98} On the record before this court, relators have established beyond a reasonable doubt that respondents violated Article XI, Section 7(A) by unnecessarily dividing the specified counties in House Districts 70, 78, 84, 91, 94, and 95.

*Article XI, Sections 7(B) and (C)*

{¶ 99} Article XI, Section 7(B) provides, "Where the requirements of section 3 of this Article cannot feasibly be attained by forming a district from a whole county or counties, such district shall be formed by combining the areas of governmental units giving preference in the order named to counties, townships, municipalities, and city wards." And under Article XI, Section 7(C), "Where the requirements of section 3 of this Article cannot feasibly be attained by combining the areas of governmental units as prescribed in division (B) of this section, only one such unit may be divided between two districts, giving preference in the selection of a unit for division to a township, a city ward, a city, and a village in the order named."

{¶ 100} Respondents contend that their apportionment plan does not violate Sections 7(B) and 7(C), because Article XI does not require the apportionment board to put all noncontiguous portions of a governmental unit into one district. Thus, they claim that their plan divides only 15 governmental units. The board's plan defines a noncontiguous area as an area that is "legally or technically a portion of a geographic unit," but is "surrounded by other land-based

---

3. In the interest of brevity, I do not address each of the violations alleged by relators but use House District 70 as an illustration of the apportionment plan's multiple violations of Section 7(A).

geographic units." In formulating their plan, respondents determined that if a governmental unit was noncontiguous, the board could put its separate portions into different districts and not count this as a division of the governmental unit because the governmental unit had been divided by local officials through annexation. Respondents are correct in pointing out that previous apportionment boards followed this same logic, but they admit that this issue has never been resolved in litigation.

{¶ 101} For the following reasons, I disagree with respondents' contention that these divisions of governmental units do not count as divisions.

{¶ 102} First, the plain language of Sections 7(B) and (C) does not authorize differing treatment of contiguous and noncontiguous governmental units. These sections do not distinguish between contiguous and noncontiguous governmental units, including counties, townships, municipalities, cities, city wards, or villages, so the plain, broad language of these constitutional provisions must apply to both. *See State ex rel. Colvin v. Brunner*, 120 Ohio St.3d 110, 2008-Ohio-5041, 896 N.E.2d 979, ¶ 49 ("R.C. 3503.06 makes no distinction between entitlement to vote in person or by absentee ballot at an election, so its plain, broad language must apply to both"); *State ex rel. Ohio Democratic Party v. Blackwell*, 111 Ohio St.3d 246, 2006-Ohio-5202, 855 N.E.2d 1188, ¶ 14, quoting *Consumer Electronics Assn. v. Fed. Communications Comm.*, 347 F.3d 291, 298 (D.C.Cir.2003) ("As United States Supreme Court Chief Justice John G. Roberts Jr. previously observed in a unanimous opinion for the United States Court of Appeals for the District of Columbia Circuit, 'the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application' ").

{¶ 103} Second, notwithstanding respondents' argument, "[c]ourts are not authorized to add exceptions that are not contained in the express language of these constitutional provisions." *State ex rel. LetOhioVote.org v. Brunner*, 123

Ohio St.3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 49. Therefore, we cannot except noncontiguous governmental units from the application of Article XI, Sections 7(B) and (C) when the express language of those provisions does not contain such an exception.

{¶ 104} Third, although Section 7(A) requires that every house district be "composed of contiguous territory" with the boundary of each district being a "single nonintersecting continuous line," there is no evidence—or argument by respondents—that applying the plain language of "governmental units" in Sections 7(B) and (C) to include both contiguous and noncontiguous would result in a violation of Section 7(A) for the creation of house districts. *See Parella v. Montalbano*, 899 A.2d 1226, 1253 (R.I.2006) ("Contiguity generally means that districts are bordering, adjoining, or touching"). To the contrary, relators' reapportionment and redistricting expert, Professor McDonald, created two apportionment plans that each split less than half the number of political subdivisions split by respondents' apportionment plan, without violating Section 7(A).

{¶ 105} Fourth, this plain-language construction of Sections 7(B) and (C) to prefer the inclusion of whole governmental units and to avoid the splitting of even noncontiguous governmental units in apportioning state legislative districts is logical. As relators note, although noncontiguous political subdivisions may be separated geographically, "they share common issues, services, and political concerns." And they are generally represented by the same officials.

{¶ 106} Fifth, we need not approve an erroneous construction of a constitutional provision simply because it has always been construed erroneously, particularly when it has not previously been litigated. Doing so would protect an unconstitutional practice.

{¶ 107} Sixth, respondents' claim that invalidating their apportionment plan in this case "would wreak havoc on the apportionment process now and in

the future" by jeopardizing the state's compliance with the Voting Rights Act, 42 U.S.C. 1973, is simply not true.

{¶ 108} Relators have met their burden of proof.

*Article XI, Section 7(D)*

{¶ 109} Section 7(D) provides that "[i]n making a new apportionment, district boundaries established by the preceding apportionment *shall be adopted to the extent reasonably consistent with the requirements of section 3 of this Article*." (Emphasis added.)

{¶ 110} Relators have established that respondents violated Section 7(D) in creating new House Districts 60, 61, 84, and 91 by altering the boundaries for house districts established by the 2001 apportionment. The preceding district boundaries did not require modification to comply with the population requirements of Section 3. In fact, respondents' evidence does not suggest that Section 3 mandated an alteration of the prior district boundaries for these districts.

*Conclusion*

{¶ 111} "The purpose of the people in enacting Article XI is clear. It was to place legislative apportionment in the hands of a separate board not subject to the control of the General Assembly, the board to be composed of representatives of the people, elected by the people and unconnected with the legislative branch of the government." *King*, 11 Ohio St.2d at 99, 228 N.E.2d 653. "The objective sought by the constitutional provisions was the prevention of gerrymandering." *Herbert*, 139 Ohio St. at 509, 41 N.E.2d 377. In practice, however, whichever political party has a majority of the members of the apportionment board uses apportionment to favor its partisan interests. The majority's decision today ensures that this will continue.

{¶ 112} I respectfully dissent.

O'CONNOR, C.J., concurs in the foregoing opinion.

_____

Wesp, Barwell, Pierre-Louis, L.L.C., and Lloyd Pierre-Louis; Murray & Murray Co., L.P.A., and Dennis E. Murray Jr.; and Perkins Coie, L.L.P., and Marc Erik Elias, Kevin J. Hamilton, Abha Khanna, and Noah Guzzo Purcell, for relators.

Baker & Hostetler, L.L.P., John H. Burtch, E. Mark Braden, and Robert J. Tucker, for respondents Governor John Kasich, Senate President Thomas E. Niehaus, and Auditor David Yost.

Michael DeWine, Attorney General, and Pearl M. Chin, Assistant Attorney General, for respondent Governor John Kasich.

Michael DeWine, Attorney General, and Renata Staff, Assistant Attorney General, for respondent Auditor David Yost.

Michael DeWine, Attorney General, and Sarah Pierce, Assistant Attorney General, for respondent Senate President Thomas E. Niehaus.

Michael DeWine, Attorney General, and Richard N. Coglianese, Michael J. Schuler, and Erin Butcher-Lyden, Assistant Attorneys General, for respondent Secretary of State Jon Husted.

_____